Supreme Court

New South Wales

---

| | |
|---|---|
| Case Name: | Forge Group Power Pty Limited (in liquidation)(receivers and managers appointed) v General Electric International Inc |
| Medium Neutral Citation: | [2016] NSWSC 52 |
| Hearing Date(s): | 2 and 3 December 2015 |
| Decision Date: | 11 February 2016 |
| Before: | Hammerschlag J |
| Decision: | Plaintiff entitled to declaratory relief that the lease is a PPS lease. The interests of any of the defendants in the Turbines vested in the Plaintiff immediately before the appointment of voluntary administrators on 11 February 2014. The Plaintiffs right or title to, or interest in the Turbines, is superior to that of the Defendants. |
| Catchwords: | PERSONAL PROPERTY SECURITIES LAW: Personal Property Securities Act 2009 (Cth) ss 8(1)(j), 10, 13(2)(a), 267 – whether the lease is a security interest – lease of four mobile gas turbine generator sets – where voluntary administrators appointed to lessee – whether the lease is excluded from being a PPS lease – whether the lessor was regularly engaged in the business of leasing goods within the meaning of s 13(2)(a) – time when requirement to be regularly engaged in such business applies – whether the business activity must be in Australia – s 8(1)(j), whether the equipment is a fixture – whether the security interest of the lessor vested in the lessee HELD: business activity under s 13(2)(a) need not be in Australia – in any event lessor was regularly engaged in such activity in Australia – the test is to be applied at the time the lease is entered into – equipment did not become a fixture – lessor's security interest vested in lessee immediately prior to the appointment of |

administrators.

| | |
|---|---|
| Legislation Cited: | Electricity Corporations Act 2005 (WA) |
| | Corporations Act 2001 (Cth) |
| | Personal Property Securities Act 2009 (Cth) |
| | Acts Interpretation Act 1901 (Cth) |
| | Personal Property Security Act 1988 (Alberta) |
| | Personal Property Security Act 1993 (Saskatchewan) |
| | Personal Property Securities Act 1999 (New Zealand) |
| | |
| Cases Cited: | Thompson v Goold & Co [1910] AC 409 |
| | Bermingham v Corrective Services Commissioner of NSW (1988) 15 NSWLR 292 |
| | David Morris Fine Cars Ltd v North Sky Trading Inc [1996] 7 W.W.R. 332; (1996) 11 P.P.S.A.C. (2d) 142 |
| | East Central Development Corp v Freighter Truck Sales (Regina) Ltd [1997] 5 W.W.R. 231; (1997) 12 P.P.S.A.C. (2d) 328 |
| | Rabobank New Zealand Ltd v McAnulty [2011] 3 NZLR 192 |
| | Agripower v Blomfield [2015] NSWCA 30 (2015) 317 ALR 202. |
| | National Australia Bank Ltd v Blacker (2000) 104 FCR 288; 179 ALR 97; [2000] FCA 1458 |
| | Australian Provincial Assurance Co Ltd v Coroneo (1938) 38 SR (NSW) 700 |
| | |
| Texts Cited: | Review of the Personal Property Securities Act 2009 – Final Report (27 February 2015) |
| | Macquarie Concise Dictionary (4th ed 2006, Macquarie Dictionary Publishers Pty Ltd) |
| | |
| Category: | Principal judgment |
| | |
| Parties: | Forge Group Power Pty Limited (in liquidation) (receivers and managers appointed) (ACN 103 678 324) - Plaintiff |
| | General Electric International, Inc. (ABN 85 002 420 751) - First Defendant |
| | Power Rental Op Co Australia LLC (ARBN 167 060 997) - Second Defendant |
| | Power Rental Asset Co Two, LLC - Third Defendant |
| | |
| Representation: | Counsel: |
| | J.C. Sheahan QC with J.G. Williams and J.K. Creamer - Plaintiff |

J.C. Giles SC with N.D. Oreb - First Defendant
I. Pike SC with J.A.C. Potts and T.J. Kane - Second
and Third Defendants

Solicitors:
Allens, Solicitors - Plaintiff
Corrs Chambers Westgarth - First Defendant
Baker & McKenzie - Second and Third Defendants

File Number(s):          2014/226778

## JUDGMENT

## WHAT THIS CASE IS ABOUT

1      HIS HONOUR:   This dispute arises out of the installation at a site eight
       kilometres south of Port Headland, Western Australia, of four model TM 2500+
       mobile gas turbine generator sets ("the Turbines") as part of a temporary power
       station established by Regional Power Corporation ("Horizon Power"), a
       statutory body formed under s 4(1)(d) of the *Electricity Corporations Act 2005*
       (WA).

2      Under a written Design Build Operate and Maintain Contract dated 23 January
       2013 ("the Head Contract"), Horizon Power retained the plaintiff, Forge Group
       Power Pty Ltd (in liquidation) (receivers and managers appointed) ("Forge
       Power" or "the Contractor"), to design the power station and supply, construct,
       test and commission all equipment installed.

3      On 5 March 2013, Forge Power, in turn, entered into a written contract for
       Rental of Power Generation Equipment and Supply of Associated Services
       ("the Lease") with the first defendant, General Electric International Inc. ("GE"),
       under which GE agreed to rent the Turbines to Forge Power for a fixed term,
       and provide to Forge Power certain services including the installation,
       commissioning and demobilisation of the Turbines.

4      On 11 February 2014, not long after the Turbines had been installed, pursuant
       to s 436A of the *Corporations Act 2001* (Cth), Forge Power appointed voluntary
       administrators. On 18 March 2014, Forge Power went into liquidation.

5      The proceedings raise for consideration significant issues concerning the
       construction and operation of provisions of the *Personal Property Securities*

*Act 2009* (Cth) ("the PPSA"), which commenced operation on 30 January 2012 and introduced an innovative (some might say, revolutionary) new national code for determining priorities between parties holding security interests in personal property. A detailed exposition of the underlying principles and rationales of the PPSA is not necessary for present purposes, suffice it to say that, amongst other things, the PPSA establishes a Register of Personal Property Securities on which security interests may be "perfected" by registering an instrument called a financing statement, and that primacy is given to the Register. No financing statement for the Lease was registered.

6      Unless the context otherwise indicates, references below to section numbers are references to sections of the PPSA.

7      The PPSA gives an expansive meaning to the concept of a security interest by, for example, including the interest of a lessor of goods under a PPS lease which, relevantly, is a lease of goods for a term of more than one year. However, a lease by a lessor who is not regularly engaged in the business of leasing goods is excluded (s 13(2)(a)).

8      The PPSA does not apply to an interest in a fixture (s 8(1)(j)). Fixtures are defined, relevantly, to mean goods that are affixed to land (s 10).

9      If the PPSA applies to the Turbines, that is, if GE's interest in them is a security interest, there is no dispute that GE's security interest became vested in Forge Power immediately before administrators were appointed (s 267(2)).

10     The ultimate question is whether the PPSA is engaged. It will be engaged if the Lease is a PPS lease. The Lease will be a PPS lease unless GE was not regularly engaged in the business of leasing goods within the meaning of s 13(2)(a) or if the Turbines became fixtures within the meaning of s 10.

11     Forge Power seeks declarations that, by operation of s 267(2), the interest of GE and the other defendants (to whom GE assigned its rights and title in the Turbines) vested in Forge Power immediately before the appointment of the administrators, and that its right or title to, or interest in, the Turbines, is superior to theirs.

12    I will deal with the issues in turn, but before doing so, it is necessary to set out the relevant provisions of the PPSA.

## RELEVANT SECTIONS OF THE PPSA

13    Section 6(1) provides:

> **Connection with Australia**
>
> (1)   This Act applies to a security interest in goods or financial property if:
>
> (a)   the location of the goods or property is in Australia; or
>
> (b)   the grantor is an Australian entity.

14    Section 8(1)(j) provides, relevantly, that:

> **Interests to which this Act does not apply**
>
> (1)   This Act does not apply to any of the following interests…
>
> …
>
> (j)   an interest in a fixture;
>
> …

15    Section 10, headed "the Dictionary", provides, relevantly, that:

> **Australian entity** means any of the following entities:
>
> (a)   an individual who is located in Australia;
>
> (b)   a company or registrable Australian body (within the meaning of the Corporations Act 2001);
>
> …
>
> **collateral:**
>
> (a)   means personal property to which a security interest is attached;…
>
> …
>
> **fixtures** means goods, other than crops, that are affixed to land.
>
> …
>
> **grantor** means:
>
> …
>
> (c)   a lessee under a PPS lease;
>
> …

16    Section 12 provides:

> **Meaning of security interest**
>
> (1)   A **security interest** means an interest in personal property provided for by a transaction that, in substance, secures payment or performance of an

obligation (without regard to the form of the transaction or the identity of the person who has title to the property).

(2)    For example, a **security interest** includes an interest in personal property provided by any of the following transactions, if the transaction, in substance, secures payment or performance of an obligation:

…

(i)    a lease of goods (whether or not a PPS lease);

…

(3)    A security interest also includes the following interests, whether or not the transaction concerned, in substance, secures payment or performance of an obligation:

…

(c)    the interest of a lessor or bailor of goods under a PPS lease.

…

17    Section 13 provides:

**Meaning of *PPS lease***

(1)    A **PPS lease** means a lease or bailment of goods:

(a)    for a term of more than one year; or

(b)    for an indefinite term (even if the lease or bailment is determinable by any party within a year of entering into the lease or bailment); or

(c)    for a term of up to one year that is automatically renewable, or that is renewable at the option of one of the parties, for one or more terms if the total of all the terms might exceed one year; or

(d)    for a term of up to one year, in a case in which the lessee or bailee, with the consent of the lessor or bailor, retains uninterrupted (or substantially uninterrupted) possession of the leased or bailed property for a period of more than one year after the day the lessee or bailee first acquired possession of the property (but not until the lessee's or bailee's possession extends for more than one year).

(2)    However, a **PPS lease** does not include:

(a)    a lease by a lessor who is not regularly engaged in the business of leasing goods;…

…

18    Section 24 provides:

**Possession**

*Possession by one party exclusive of possession by others*

(1)    A secured party cannot have *possession* of personal property if the property is in the actual or apparent possession of the grantor or debtor, or another person on behalf of the grantor or debtor.

(2)   A grantor or debtor cannot have *possession* of personal property if the property is in the actual or apparent possession of the secured party, or another person on behalf of the secured party.

*Timing rule for possession of goods transported by common carrier*

(3)   A grantor or debtor to whom goods are transported by a common carrier acquires possession of the goods only when the earlier of the following occurs:

(a)   the grantor or debtor, or another person at the request of the grantor or debtor, actually acquires possession of the goods;

(b)   the grantor or debtor, or another person at the request of the grantor or debtor, acquires possession of a document of title to the goods.

…

19   Section 19(1) provides:

### Enforceability of security interests against grantors – attachment

*Attachment required for enforceability*

(1)   A security interest is enforceable against a grantor in respect of particular collateral only if the security interest has attached to the collateral.

20   Section 19(2)(a) provides:

*Attachment rule*

(2)   A security interest **attaches** to collateral when:

(a)   The grantor has rights in the collateral, or the power to transfer rights in the collateral to the secured party; and

(b)   either:

(i)   value is given for the security interest; or

(ii)   the grantor does an act by which the security interest arises.

21   Section 19(5) provides:

*Goods leased, bailed, consigned or sold under a conditional sale agreement.*

(5)   For the purposes of paragraph (2)(a), a grantor has rights in goods that are leased or bailed to the grantor under a PPS lease, consigned to the grantor, or sold to the grantor under a conditional sale agreement (including an agreement to sell subject to retention of title) when the grantor obtains possession of the goods.

22   Section 21 provides:

### Perfection – main rule

(1)   A security interest in particular collateral is **perfected** if:

(a)   the security interest is temporarily perfected, or otherwise perfected, by force of this Act; or

(b)   all of the following apply:

(i)    the security interest is attached to the collateral;

(ii)   the security interest is enforceable against a third party;

(iii)   subsection (2) applies.

(2)    This subsection applies if:

(a)    for any collateral, a registration is effective with respect to the collateral; or

(b)    for any collateral, the secured party has possession of the collateral (other than possession as a result of seizure or repossession); or

…

(3)    A security interest may be perfected regardless of the order in which attachment and any step mentioned in subsection (2) occur.

(4)    A single registration may perfect one or more security interests.

23    Sections 24(1), (2) and (3) provide:

*Possession by one party exclusive of possession by others*

(1)    A secured party cannot have **possession** of personal property if the property is in the actual or apparent possession of the grantor or debtor, or another person on behalf of the grantor or debtor.

(2)    A grantor or debtor cannot have **possession** of personal property if the property is in the actual or apparent possession of the secured party, or another person on behalf of the secured party.

*Timing rule for possession of goods transported by common carrier*

(3)    A grantor or debtor to whom goods are transported by a common carrier acquires possession of the goods only when the earlier of the following occurs:

(a)    the grantor or debtor, or another person at the request of the grantor or debtor, actually acquires possession of the goods;

(b)    the grantor or debtor, or another person at the request of the grantor or debtor, acquires possession of a document of title to the goods.

24    Section 267 provides:

**Vesting of unperfected security interests in the grantor upon the grantor's winding up or bankruptcy etc.**

*Scope*

(1)    This section applies if:

(a)    any of the following events occurs:

…

(ii)    an administrator of a company or a body corporate is appointed (whether under section 436A, 436B or 436C of the *Corporations Act 2001*, under that section as it is applied by force of a law of a State or Territory, or otherwise);

…

(b)   a security interest granted by the body corporate, company or bankrupt is unperfected at whichever of the following times applies:

…

(ii)   in the case of any other company or body corporate—when, on a day, the event occurs by virtue of which the day is the section 513C day for the company or body, within the meaning of the *Corporations Act 2001* (including that Act as it is applied by force of a law of a State or Territory, or otherwise);

…

(2)   The security interest held by the secured party vests in the grantor immediately before the event mentioned in paragraph (1)(a) occurs.

…

## WAS GE REGULARLY ENGAGED IN THE BUSINESS OF LEASING GOODS?

25   The first issue which divides the parties is whether, in determining if a lessor is or is not regularly engaged in the business of leasing goods for the purpose of s 13(2)(a), regard may be had to activity outside of Australia. Forge Power contends that business activity outside Australia is to be taken into account, whereas GE and the other defendants contend that regard is to be had only to business activity within Australia.

26   It is common cause that at all material times, GE has, outside of Australia, been engaged in the business of leasing goods. Accordingly, if activity outside of Australia is captured, the exclusion in s 13(2)(a) will not apply in this case.

27   The parties are in dispute as to whether GE was regularly engaged in such business within Australia. They are also divided as to the point in time the test in s 13(2)(a) applies.

28   Forge Power contends that the test applies at the date the security interest is created, which it contends is the date of entry into the Lease. GE and the other defendants contend that the test applies either at the date on which the security interest attaches to the collateral, which they argue was when Forge Power obtained possession of the Turbines (which they say was in January or February 2014) or, alternatively, on the date of the event which brings about the vesting of the security interest of GE in Forge Power, which they argue is the date of the appointment of the administrators. They contend that at both of these times, GE was not regularly engaged in the business of leasing goods in Australia, but more particularly, they say it was not so engaged from and after

22 October 2013 when GE's large-scale, long-term, temporary power generation rental business was sold.

29   For the reasons which follow, I have concluded that:

(1)   in testing whether a person is (or is not) regularly engaged in the business of leasing goods, regard is to be had to activity wherever it occurs, and not only to activity in Australia.

(2)   the test applies at the time the Lease was entered into;

(3)   when the Lease was entered into, and at all material times thereafter, GE was regularly engaged in the business of leasing goods within Australia.

**Australia?**

30   There are a number of considerations which, in my view, make it clear that s 13(2)(a) does not restrict business activity to be regarded to that which solely occurs within Australia.

31   First, the plain words of s 13(2)(a) place no such geographic limitation or restriction on the activity to be assessed, and there is no warrant to read them as so doing: see *Thompson v Goold & Co* [1910] AC 409 at 420; *Bermingham v Corrective Services Commissioner of NSW* (1988) 15 NSWLR 292 at 302.

32   Indeed, the general operation of the PPSA is not confined to goods or property in Australia. By s 6, it applies to a security interest in goods or financial property (even if they are outside Australia) if the grantor is an Australian entity.

33   Secondly, the restriction would not serve the policy underlying the s 13(2)(a) exclusion. The evident (perhaps self-evident) purpose of the exclusion was referred to in the *Review of the Personal Property Securities Act 2009 – Final Report* (27 February 2015) commissioned by the Attorney-General as required by s 343 of the PPSA, and tabled in Parliament on 18 March 2015, in the following terms:

> 4.3.5.7.1 ... Any lease that satisfies the term requirements in s 13 has the capacity to mislead outsiders. It could also be unclear for such a lease whether it is also an in-substance security interest under s 12(1). The thinking behind s 13 accepts however that it would not be fair to impose the implications of s 13 and the Act on *ad hoc* lessors, and that it should only apply to lessors that are in the business of leasing and so should be expected to have investigated the content of the laws that affect their business, including the Act. There is no need in this context to limit the application of the section to leases of goods of the particular type that the lessor regularly leases out.

34    A leasing transaction within Australia, by an entity regularly engaged in such business internationally, cannot fairly be described as *ad hoc.* Such an entity has no less an incentive to investigate local law requirements when it engages in business activity in this jurisdiction, than does an entity regularly carrying on such business only within Australia. Concomitantly, such an entity wishing to conduct business within Australia would not get the benefit of being able to register its lease.

35    Thirdly, components of a transaction may involve cross-border activity. The limitation which the defendants suggest raises the uninviting spectre of lengthy and detailed examination of such activity in a quest to determine whether activity outside of Australia is part of carrying on business within it.

36    The defendants submit that the construction for which they contend is necessitated by the application of s 21(1)(b) of the *Acts Interpretation Act 1901* (Cth), which provides:

> **21   Office etc. means office etc. of the Commonwealth**
>
> (1)   In any Act:
>
> …
>
> (b)   references to localities jurisdictions and other matters and things shall be construed as references to such localities jurisdictions and other matters and things in and of the Commonwealth.

37    They submit that business can only be engaged in at a locality, and that it follows that the reference to such activity in s 13(2)(a) is a reference to a locality within the meaning of the section, with the consequence that the reference to that activity is a reference to that activity in, and only in, the Commonwealth.

38    I reject the submission. First, s 13(2)(a) contains no reference to a locality, but rather to an activity. Secondly, engaging in business does not have to occur in a single place. Thirdly, I consider that s 2(2) of the *Acts Interpretation Act 1901* (Cth) applies. It provides:

> **2   Application of Act**
>
> …
>
> (2)   However, the application of this Act or a provision of this Act to an Act or a provision of an Act is subject to a contrary intention.

39    I consider that there is such a contrary intention.

**Point in time to which s 13(2)(a) is directed**

40    Section 12(3) provides that a security interest includes the *interest of a lessor under* a PPS lease. Section 13(1) provides, relevantly, that a PPS lease *means a lease* of goods for a term of more than one year. The exclusion in s 13(2)(a) applies to a *lease by a lessor* who *is* not regularly engaged in the business of leasing goods. Each of these provisions is directed to the point in time at which the interest of the lessor under the instrument arises, namely, the time at which mutual rights and obligations of the parties under it are brought into existence. In my opinion, in this case, this was when the Lease was entered into. The test is not directed to the time for performance of obligations undertaken, such as payment of rent or passing of possession of the leased goods. In any event, as will appear below, I consider that GE was regularly engaged in the business of leasing at each of these times.

**Regularly engaged in the business of leasing goods**

41    The Court was not referred to any pertinent Australian authority on the meaning of the precise phrase in s 13(2)(a). The equivalent sections in various Canadian provincial enactments (upon which the PPSA is broadly based), including s 1(1)(y) of the *Personal Property Security Act 1988* (*Alberta*) and s 2 of the *Personal Property Security Act 1993* (*Saskatchewan*), as well as s 16(1)(i)(c) of the *Personal Property Securities Act 1999 (New Zealand),* have been the subject of judicial consideration in those countries.

42    The Canadian and New Zealand enactments also exclude from the definition of security interest a lease involving a lessor who is not regularly engaged in the business of leasing goods.

43    The Canadian position is stated in *David Morris Fine Cars Ltd v North Sky Trading Inc* [1996] 7 W.W.R. 332; (1996) 11 P.P.S.A.C. (2d) 142 (*David Morris*). A car dealer advertised itself as being in the business of buying, selling and leasing vehicles, even though it only directly arranged one or two leases a year, and normally referred leases to the manufacturer's credit company. The dealer entered into a 46 month direct lease of a vehicle to a corporation, but did not register it. The lease was assigned to a bank. The lessee went

bankrupt. There was a priority contest between the bank and the trustee which depended on whether the car dealer was exempt from a requirement to perfect its security because it was not regularly engaged in the business of leasing.

44   At [1996] 7 WWR 332, 336–337 [12]–[14], the Alberta Court of Appeal held as follows:

> [12]   The Bank contends that the practice of occasionally leasing vehicles does not amount to regularly engaging in the business of leasing. Reliance is placed on the definition of "regular" in the Pocket Oxford Dictionary, 7th ed., 1984, p. 627 which provides:
>
>> … conforming to a rule or principle, systematic, harmonious, symmetrical; acting or done or recurring uniformly or calculably in time or manner habitual, constant, orderly;
>
> According to the bank, that definition suggests the need for a constant rather than occasional or sporadic pattern of leasing. However, we do not agree that the frequency of leasing is determinative. Rather, we are of the view that so long as leasing was a proper component of the business, it can correctly be said that leasing was regularly engaged.
>
> [13]   The Bank also argues that the chambers judge fell into error in relying upon the Saskatchewan Court of Appeal decision in Royal Bank of Canada v. 216200 Alta Ltd. (1987) 1 W.W.R. 545. That case involved consideration of the clause "in the ordinary course of business" found in s. 30(1) of the Saskatchewan Personal Property Act, S.S. 1979-80 c. P-6.1. That section is similar to s. 30(2) of the PPSA. Those sections provide that buyers or lessees of goods sold in the ordinary course of business take the property free of perfected or unperfected security interests. In Royal Bank Vancise J.A. relied on Fairline Boats Ltd. v. Leger (1980), 1 P.P.S.A.C. 218 (Ont. H.C.), in which Linden J. listed a number of factors to be considered in determining whether a sale occurs in the ordinary course of business. Included in those factors was the need to consider whether the transaction is one that is normally entered into by people in the seller's business. Applying those factors Vancise, J.A. concluded:
>
>> In my opinion, a sale, in the ordinary course of business, includes a sale to the public at large, of the type normally made by the vendor in a particular business where the basic business dealings between buyer and seller are carried out under normal terms and consistent with general commercial practice. It does not include sale between individual buyers. Here the sale of goods of the kind normally sold by the vendor were made at its premises, to members of the public at large, under normal terms and conditions of sale of retail merchants. The sales were clearly sales to buyers in the ordinary course of business.
>
> We agree that the clause "regularly engaged in business" in s. 1(1)(y) of the PPSA means something quite different than the clause "in the ordinary course of business" found in s. 30(2). The former pertains to whether the lessor is in the business of leasing. The focus is the business practice of that lessor. The latter pertains to whether the particular transaction was made in the course of

conducting that business. The focus is whether other persons in that type of business engage in similar transactions.

[14]   Nonetheless, the reliance placed by the chambers judge on Royal Bank of Canada does not trouble us. The factors to consider in determining the application of either clause are similar. The difference is that in determining whether a lessor regularly engages in the business of leasing, those factors are applied to the consideration of whether leasing is a proper component of the lessor's business. That determination is a question of fact. We see no palpable or overriding error in the conclusion of the chambers judge that this lessor regularly engages in leasing.

45    This approach was also taken by the Saskatchewan Queen's Bench in *East Central Development Corp v Freighter Truck Sales (Regina) Ltd* [1997] 5 W.W.R. 231; (1997) 12 P.P.S.A.C. (2d) 328, where a truck had been leased from an entity (Freightliner) which was primarily in the business of selling new and used trucks. It was not in the business of financing truck purchases. At [18], Gunn J said:

> …Freightliner does most of its business in other ways, but the true lease transaction was available and was used on rare occasions. On this basis, Freightliner cannot qualify as someone not regularly involved in leasing goods. Leasing trucks is a part of its business, even though a small part. The exemption provision in ss. 2(y)(iv) was not designed to exempt Freightliner, when it was part of its business to lease trucks…

46    Approaching the matter in this way, the question (which is one of fact) is whether or not, at the material time, leasing goods was a proper component of GE's business.

47    In *Rabobank New Zealand Ltd v McAnulty* [2011] 3 NZLR 192 at [46]–[47] the New Zealand Court of Appeal held, obiter, as follows:

> It is not strictly necessary for us to deal with the controversy about the meaning of "regularly" in s 16(1)(i)(c). The Canadian cases reflect their very unusual facts and we hesitate to draw from them any generic principle. Each case will depend on its facts. But we do consider that it requires some straining of the concept "regular" to say it includes a single, isolated transaction.
>
> We doubt that that is what Parliament intended. It is clear that a course of business involving a series of leasing transactions will involve regular engagement in the business of leasing. We think it is equally clear that a single transaction in circumstances where it can be established that the transaction was a one-off would not be "regular". Where a transaction was the first but has been followed by others, a good case can be made for the proposition that even the first was "regular" because it was the start of the regular engagement in the business. That will be a factual issue in the particular case.

48      The Court went on to hold that on the facts, the transaction in question was a single one intended to be the sole transaction of that kind and would not have involved a regular engagement in the business of leasing goods.

49      The word "regular" can in one of its meanings connote periodic or a recurrence at fixed times. However it can also, and in this case in my view does, mean, as the Canadian authorities consider, normal, that is, not abnormal in the context of the lessor's business, but a proper component of it: see *Macquarie Concise Dictionary* (4th ed 2006, Macquarie Dictionary Publishers Pty Ltd) at 1025.

50      The New Zealand approach does not, I respectfully suggest, sufficiently recognise that the exclusion is directed to activity which constitutes engaging in the business of leasing, not to engaging in the activity of entering into leases.

51      Engaging in the business of leasing is clearly a concept of wider reach than merely entering into leases. For example, a person who sets up a significant infrastructure, including, say, acquiring significant capital equipment for lease and then advertises its ability and willingness to lease that equipment would be engaged in the business of leasing, and may be doing so regularly, before any particular transaction is concluded and in my opinion, even if none ever is.

52      In my opinion, the correct approach is to recognise that frequency or repetitiveness of transactions is a factor relevant to, and in an appropriate case may be the critical factor in, the assessment of whether the leasing business being engaged in is regular. But it is not to be equated with it, as the New Zealand approach appears to require.

53      The New Zealand approach would not, incorrectly, in my opinion, permit a conclusion of regularity where an initial transaction was intended to be followed by others, but no more transactions of the type concerned actually eventuated, despite the best intentions, advertised willingness over a significant period of time and ability of the lessor to enter into more. In my opinion, in considering frequency or repetitiveness as an element of regularity of business, account may be taken of more than simply actual transactions entered into.

54      In any event, in the present case, the facts establish that GE was regularly
        engaged in the business of leasing even if frequency or repetitiveness of
        transactions is a necessary component of the concept.

55      I turn to the facts.

**The facts**

56      GE is incorporated in Delaware, United States. It has been registered as a
        foreign company doing business in Australia since 22 June 1995.

57      It is a wholly owned subsidiary of General Electric Company (General Electric),
        a formidable United States Corporation headquartered in Connecticut.

58      It has a presence in many foreign markets and it has established foreign
        branches in over 100 countries, including Australia. Its activities are organised
        into different businesses according to their specific industry focus. One of its
        businesses is concerned with providing solutions for power generation
        requirements. The products in its portfolio include a variety of turbines and
        engines.

59      Prior to about 2006, GE carried on a business renting equipment related to
        power generators. In about 2006, it sold its rental business, excluding that part
        relating to the leasing of turbine generators. As it was registered to carry on
        business in over 100 countries, GE continued to own and rent newly
        manufactured turbine generators.

60      So far as its business in Australia is concerned, in March 2003, GE entered
        into an agreement with Newcrest Mining over a term of six years to lease, upon
        request, a spare turbine generator, should it be needed, to be used to supply
        electrical power to Newcrest's Telfer mine in Western Australia. On 23 May
        2008, Newcrest made a request to lease a spare turbine generator until
        January 2011.

61      Until 2013, when General Electric sold its large scale, long term temporary
        power generation business, GE was the entity within the group that was
        predominantly responsible for the leasing and sale of turbine generators
        globally. It owned approximately 14 of these which were leased globally (and
        internally within General Electric).

62    According to the evidence of Mr Steven Lawrence, a Tax Director of General
      Electric, GE was at the time of the sale of that business leasing four turbine
      generators in Australia. This is apparently a reference to an agreement dated
      26 July 2004 between an entity styled GE Energy Rentals Pty Ltd and Western
      Power Corp of Perth for the rental of four turbine generators for use at Pinjar
      Gas Turbine Station, Pinjar, Western Australia, for a period to end no earlier
      than 31 March 2005.

63    On 26 November 2009, GE entered into a Plant, Parts and Services
      Agreement with Atco Power Australia (Karratha) Pty Ltd ("Atco") to supply parts
      and services for maintenance of the Karratha power station near Dampier in
      Western Australia, for a term of 20 years. The Agreement provides that during
      its term, Atco can elect to enter into a Lease Engine Support Agreement, which
      would entitle it to rent replacement turbine generators from GE if needed. To
      this point, Atco has not made such an election, and GE has not provided any
      replacements.

64    Between March and October 2012, GE advertised and promoted the possible
      leasing of the Turbines for the power station to various potential bidders for the
      power station project. The material included information of GE's 'Proven
      Experience' which, since 2000, was stated to include 29 mobile turbine rental
      projects in 12 countries, including 4 units in Western Australia from 2004 for a
      term of 5 years.

65    On 29 March 2012, GE entered into a Contractual Services Agreement with
      Birla Nifty Pty Ltd ("Birla Nifty"), which operates turbine generators at the Birla
      Nifty copper mine near Telfer, Western Australia, to provide for a term expiring
      on 22 May 2018, services including replacing turbine generators if needed. The
      Agreement makes provision for Birla Nifty to participate in and become a
      member of a Lease Pool Membership Service, which would give access to
      turbine generators in a pool established by General Electric entities. To
      facilitate the provision of turbine generators, GE, internally, entered into an
      Engine Lease Agreement under which GE would be provided with an engine
      for delivery to Birla Nifty if it was required. On 20 April 2015, Birla Nifty
      informed GE that it wished to terminate its participation in the Lease Pool

Membership Service. At no time did GE provide Birla Nifty with any replacement turbine generator.

66   On 5 March 2013, GE and Forge Power entered into the Lease.

67   On 22 October 2013, GE's large scale, long-term, temporary power generation rental business was sold to APR Energy Plc. On 27 October 2013 GE assigned the benefit of the Rental Agreement to the second defendant ("OpCo"), a company incorporated in Delaware and registered as a foreign company doing business in Australia since 19 December 2013, and on 27 October 2013 it assigned title to the Turbines to the third defendant ("AssetCo"), also a company incorporated in Delaware.

68   On 21 November 2014, GE entered into an Agreement with Origin Energy Power Ltd ("Origin") to provide a replacement turbine generator for use by Origin at the Ladbroke Grove Power station, Penola, South Australia, whilst a turbine operated by Origin was being repaired under warranty. The replacement was provided free of charge.

69   On 25 August 2015, GE made available to GE Oil & Gas Australia Pty Ltd, for ad hoc purposes, a temporary turbine generator.

70   It is common cause that on and from 27 October 2013, GE has provided replacement turbine engines in Australia where it has sold (either before or after 27 October 2013) a power generation unit containing a turbine engine to a customer, the customer has engaged GE to provide maintenance services to that power generation unit, and the maintenance services require the existing turbine engine to be removed from the power generation unit temporarily. For the duration of the maintenance of the turbine engine, GE provides a replacement turbine engine in accordance with forms of standard agreement styled, either, a Member Agreement (where the customer pays an annual fee for the period of the agreement and a usage fee for the period it gets a replacement engine), or a Non Member Agreement (where the customer does not pay an annual fee but an initial fee and a usage fee for the period it gets a replacement engine). Provisions for replacements may be contained in other agreements, which include so-called Contractual Services Agreements. It was

not contended that these types of arrangements should not be characterised as leasing.

71 There are approximately 280 Member Agreements and Non-Member Agreements in operation outside of Australia.

**Discussion**

72 The following establishes that from 2003, and continuing even until now, GE has been regularly engaged in leasing both in the sense of it being a proper component of GE's business (regarding repetitiveness as a relevant element) and also if repetitiveness is an essential requirement:

  (a)   GE advertised and promoted its desire to lease the Turbines by referring and relying upon the turbine generators which had been leased for use at the Pinjar Gas Turbine Station.

  (b)   at the date of the Lease, it was contractually obliged to both Atco and Birla Nifty to supply a rent replacement turbine if needed.

  (c)   after the Lease it concluded arrangements with Origin to provide a replacement turbine generator.

  (d)   after the Lease it made a temporary turbine engine available to GE Oil & Gas Australia Pty Ltd.

  (e)   after 27 October 2013 it has continued to provide replacement turbine engines.

## DID THE TURBINES BECOME FIXTURES?

**The issues**

73 First, the parties are divided as to whether, where the PPSA defines fixtures as goods that are affixed to land, it has in mind the common law test for affixation as reflected in the maxim *quicquid plantatur solo, solo cedit* (whatever is affixed to the ground belongs to the ground), or some other test. Forge Power contends that the common law test applies. GE and the other defendants contend that the definition in s 10 introduces a bespoke meaning of affixed to land, being a non-trivial attachment.

74 Secondly, the parties are divided as to whether, on either test, the Turbines have become affixed to land. Forge Power contends that the Turbines remained chattels and did not become affixed. Somewhat ironically, because of the manner in which the PPSA operates, GE and the other defendants find

themselves arguing that their property has become affixed to Horizon Power's land.

75   For the reasons which follow, I hold that:

(1)   the words "affixed to land" in the definition of fixtures in s 10 means affixed according to common law concepts; and

(2)   the Turbines did not become fixtures.

**Meaning of "affixed"**

76   The defendants put that, where the definition of fixtures in s 10 refers to affixed to land, this does not embrace the well-known common law concepts, but is a bespoke definition connoting any "non-trivial attachment" of the goods to land.

77   I do not accept the submission. Leaving aside the difficulty of ascribing meaning to the notion of "non-trivial", one of the critical demarcation lines underpinning the operation of the PPSA is that between personal property and land. Land is expressly excluded from the definition of personal property in s 10, and consequently, from the definitions of interest and security interest in ss 10 and 12(1).

78   Applying the common law definition accords with this demarcation because goods affixed, according to common law concepts, become part of the land.

79   There was little debate about the applicable principles under common law. They are settled. Whether an item has become a fixture depends upon the objective intention with which the item was put in place, having regard to the degree and object of annexation, but each case depends on its own circumstances: *Agripower v Blomfield* [2015] NSWCA 30 at [74]–[81]; (2015) 317 ALR 202.

80   In *National Australia Bank Ltd v Blacker* (2000) 104 FCR 288; 179 ALR 97; [2000] FCA 1458 (cited with approval in *Agripower v Blomfield*) at [10] Conti J said:

> There is a variety of general principles which should be considered in assessing whether an item of personal property has become attached to land in a manner designed to achieve a specific objective or a variety of objectives, such as to become a part of the realty and therefore, a fixture. Whether an item has become a fixture depends essentially upon the objective intention with which the item was put in place. The two considerations which are commonly regarded as relevant to determining the intention with which an item

has been fixed to the land are first, the degree of annexation, and secondly, the object of annexation.

81    Conti J relied on the following frequently cited passage from the judgment of Sir Frederick Jordan in *Australian Provincial Assurance Co Ltd v Coroneo* (1938) 38 SR (NSW) 700 at 712:

> The test of whether a chattel which has been to some extent fixed to land is a fixture is whether it has been fixed with the intention that it shall remain in position permanently or for an indefinite or substantial period, or whether it has been fixed with the intent that it shall remain in position only for some temporary purpose. In the former case, it is a fixture, whether it has been fixed for the better enjoyment of the land or building, or fixed merely to steady the thing itself, for the better use or enjoyment of the thing fixed. If it is proved to have been fixed merely for a temporary purpose it is not a fixture. The intention of the person fixing it must be gathered from the purpose for which and the time during which the user in the fixed position is contemplated. If a thing has been securely fixed, and in particular if it has been so fixed that it cannot be detached without substantial injury to the thing itself or to that to which it is attached, this supplies strong but not necessarily conclusive evidence that a permanent fixing was intended. On the other hand, the fact that the fixing is very slight helps to support an inference that it was not intended to be permanent. But each case depends on its own facts.

82    At [13] Conti J went on to identify the factors that the courts generally ought to take into account in determining the purpose or object and degree of annexation as follows:

- whether the attachment was for the better enjoyment of the property generally or for the better enjoyment of the land and/or buildings to which it was attached;
- the nature of the property the subject of affixation;
- whether the item was to be in position either permanently or temporarily;
- the function to be served by the annexation of the item.

83    At [14] Conti J identified the factors that the courts generally ought to take into account in determining the purpose or object and degree of annexation as follows:

- whether removal would cause damage to the land or buildings to which the item is attached;
- the mode and structure of annexation;
- whether removal would destroy or damage the attached item of property;
- whether the cost of renewal would exceed the value of the attached property.

84    In *Agripower v Blomfield* Sackville AJA (with whom Bathurst CJ and Beazley P
      agreed) remarked at [81] that:

>       The factors identified by Conti J are useful guides, but, as his Honour
>       indicated, they are neither exhaustive nor definitive.

85    I turn to the facts.

**The facts**

86    The first two Turbines were delivered to the site on 19 October 2013, and two
      more were delivered on 11 November 2013. The Turbines remain *in situ*.

*The Head Contract*

87    On 21 January 2013, Horizon Power and Forge Power entered into the Head
      Contract. Forge Power became obliged to perform Works under the Head
      Contract, which are described in cl 1.1 of the Head Contract, relevantly, as all
      work required to be performed in connection with the design, engineering,
      procurement, supply, construction, testing and commissioning and start-up of
      the Plant.

88    Plant is defined, relevantly, to mean "the South Headland Temporary Power
      Station (including the…Equipment)". The equipment to be supplied included
      "Generator Equipment", which is defined to include "Generator Sets" which is
      defined to mean "one or more gas turbine and generator package(s) including
      gas turbine, alternator and all auxiliary apparatus, equipment and plant as part
      of each gas turbine and generator package".

89    The Head Contract includes a Scope of Works, which provides that the Plant
      would include dual fuel open cycle gas turbines and a switchyard. The Scope
      of Works records that the switchyard would consist of "double bus design" and
      would have to be expandable. It provides that the gas turbine generators "will
      be leased for a fixed term". The Head Contract provides that once the Plant is
      in operation, Forge Power is to make available to Horizon Power electricity
      generated by the Plant. The End Date of the Head Contract is specified as 31
      December 2015 with provision for Horizon Power to elect to extend it, but only
      so that the aggregate of all additional periods do not exceed 18 months.

90    Clause 17.1(a) of the Head Contract is relevantly in the following terms:

> …all rights, title and ownership in the Materials & Equipment (excluding Contractor Materials & Equipment and the Generator Sets) required to provide the Work under Contract in the O&M Phase, passes to Horizon Power upon delivery to the Site of those Materials & Equipment.

91    The O&M Phase (presumably meaning operation and maintenance) is the period from the completion of the works to the Expiry Date, which is six weeks from the End Date.

92    Part F of the Head Contract is entitled Permanent Works. It, together with definitions in the Head Contract, envisages that Horizon Power may undertake works to facilitate the transition of the Plant to a permanent facility on property adjacent to the site.

The Lease

93    Forge Power and GE entered into the Lease on 5 March 2013. Its provisions are referred to in it as Articles.

94    Its Preamble provides that it is a "Contract for rental of power generation equipment and supply of associated services…entered into as of the 5th day of March, 2013 ("Effective Date")".

95    The Recitals to the Lease record that:

> **WHEREAS,** GE is engaged in the business of renting various kinds of power plant equipment and of providing services in support of the installation of the rental equipment and use thereof; and
>
> **WHEREAS,** Forge Power desires to rent from GE, and GE desires to rent to Forge Power the Equipment described herein; and Forge Power desires to purchase the Services described herein all in connection with the Project located at South Hedland, WA, Australia, all subject to the terms set forth herein;
>
> …

96    The Lease contains the following definitions:

> "Delivery" shall mean ExWorks (INCOTERM 2010) to the Delivery Point.
>
> "Delivery Point" shall mean GE's facility at Houston, Texas, USA.
>
> "Equipment" shall mean the power generation equipment described in the "Power Generation Rental Equipment" portion of Attachment 1.

97    Article 1 provides, relevantly, that Forge Power shall rent four TM 2500+ Units for the Rental Term. The Rental Term is specified in Article 9 to commence on 1 January 2014 and to continue for two years ending on 31 December 2015,

subject to an extension pursuant to Article 10, which provides for Forge Power, before 1 July 2015, in writing to obtain an extension of the Rental Term up to 30 June 2016 and thereafter to extend it for up to 18 additional months.

98   Article 2 provides that the services provided by GE are limited to items described in Attachment 1, Section II, which describes the services to be installation of the Equipment, commissioning of the Equipment and demobilisation of the Equipment.

99   Article 4 provides that the Equipment Rental Price for the Rental Term is $28,662,706.00 and the price for the Services for the Rental Term is $4,598,294.00, making a total of $33,261,000.00.

100   Article 5 provides, relevantly, that Forge Power shall be responsible for transportation of the Turbines, spare parts and initial consumables and shall, at its expense, arrange carriage by a reputable transport operator acceptable to GE.

101   Article 9 includes the following statement:

> GE and Forge Power confirm their intent that the rental of the Equipment as designated by and pursuant to this Contract shall be a true lease and not a sale or financing transaction and that neither the execution nor the filing of any financing statement with respect to any of the Equipment or with respect to the Contract, or the recording thereof, shall in any manner imply otherwise.

102   Article 11 provides that if Forge Power fails to provide GE Unimpeded Access to the Equipment on the expiration or termination of the Rental Term, or, in the event Forge Power is responsible for return transportation of the Equipment to GE, and the Equipment has not been received by GE on the expiration or termination of the Rental Term, Forge Power shall be obligated to pay GE liquidated damages until the date that the Equipment is returned to the designated GE location in good condition. A formula for the calculation of liquidated damages is provided.

103   Article 12.7 provides that if Forge Power is in possession of any Equipment at the time GE suspends or terminates the Contract or portion thereof pursuant to the terms and conditions in this Contract, in addition to its other rights thereunder, GE may also: require Forge Power at Forge Power's expense to return promptly all or any portion of the Equipment to GE; enter upon the

premises where the Equipment is located and take immediate possession and remove some or all of it, all without liability to Forge Power; or exercise any other right or remedy available to GE under any applicable law. No right or remedy of GE referred to in this Article is exclusive, but each is cumulative and in addition to any other right or remedy otherwise available to GE at law or in equity.

104   Article 13 provides, relevantly, that Forge Power is responsible for ensuring the prompt and timely return of the Equipment to GE. Upon demobilisation of the Equipment, Forge Power must arrange for Equipment exportation and/or shipment back to GE's point of origin or designated location within 30 days after Equipment demobilisation.

105   Article 14 includes a provision in the following terms:

> The Equipment is, and shall at all times be and remain, solely and exclusively the property of GE or its affiliates, and no right, title or interest in the Equipment shall pass to Forge Power other than, conditioned upon Forge Power's compliance with and fulfilment [sic] of the terms and conditions of the Contract, the right of Forge Power to maintain, as Forge Power, possession and use as described in the Contract for the Rental Term. The Equipment is, and shall at all times remain, personal property notwithstanding that the rented Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to any other personal or real property.

106   Article 20 provides, relevantly, that Forge Power shall keep the Equipment and its interest in the Contract free and clear of all liens, charges, security interests and encumbrances, and shall indemnify GE for all reasonable costs resulting from any breach of this obligation.

107   On 28 March 2013, Forge Power made a down payment to GE under the Lease of $US 1.65 million.

*Delivery and Installation*

108   On 14 June 2013, Forge Power entered into a formal instrument of agreement with P.T. Rolitrans International for transport of the Turbines from GE's facility in Houston, Texas, to the power station site.

109   Cargo delivery receipts signed by P.T. Rolitrans International and Forge Power, respectively, established that Turbines TM33 and TM35 were received by P.T. Rolitrans International at the Delivery Point in Houston, Texas, on 19

October 2013 and Turbines TM36 and TM37 were received on 11 November 2013.

110  The evidentiary material relating to the nature of the Turbines, the installation process and demobilisation procedure consisted of affidavits and a fairly significant body of other material, including photographs, plans, graphic depictions and an Installation and Commissioning manual ("the Manual").

111  The Manual describes the Turbines as comprising trailers that contain the gas turbine generator, air filtration and exhaust equipment, fuel systems, switch gear, lubricating systems, fire protection equipment, and auxiliary systems. There are two trailers, a main trailer which carries and houses the Turbine in a turbine enclosure, the Generator and switch gear. The auxiliary trailer carries and houses a control house, cooling system, auxiliary skid, and generator exhaust silencer.

112  The Turbines may be configured in one of two configurations. They may be either installed at a site, and configured as an operating generator, or in a transport configuration, in which the Turbine comprises two very large trailer units, together with several flat-bed truckloads of support equipment (described as ship loose).

113  When in the transport configuration, each of the two trailer units can be towed on a normal road by an oversized prime mover or semi-trailer truck.

114  The main trailer contains the bulk of the machinery, including the gas turbine, the electric generator and associated systems, and weighs approximately 75 metric tonnes. In its installed configuration, the main trailer is 21,305 mm long, 3,124 mm wide and 9,363 mm high. In its transport configuration, the main trailer is 33,825 mm long, 3,124 mm wide and 4,172 mm high. The auxiliary trailer contains the auxiliary support systems, various pumps, and a control room. The auxiliary trailer weighs approximately 27 metric tonnes. In both the transportation and installed configurations, the auxiliary trailer is 14,496 mm long, 2,591 mm wide and 4,000 mm high. Accordingly, the total weight of a turbine is approximately 102 metric tonnes. The dimensions of a Turbine, in its installed configuration, are approximately 21,305 mm long, 6715 mm wide and 9,363 mm high.

115  There are manufacturer's specifications for the surface on which the Turbines will be put. A concrete foundation is optional, because they can be parked on flat ground. If there is no concrete foundation, then it is necessary for the earth to be levelled and compacted. The site for installation requires careful preparation for the Turbines to be operated safely and properly.

116  On arrival at the site, the prime mover positions the Turbines in the desired position on the foundation at the site. Then, the trailers are lowered and stabilised by eight so-called landing gear mounted on each trailer, which have telescoping feet hand-cranked until they make contact with the ground or foundation on which the Turbines are positioned. The landing gear rest on spacers (metal pedestals that sit between the landing gear and the ground or foundation). Once the stabilising is complete, the prime mover will disconnect from the trailers.

117  Figure 1 below shows the main trailer set up.

**Figure 1**







118   As can be observed, the main trailer has wheels to facilitate being towed. The same is the case with the auxiliary trailer, which is depicted in Figure 2. The wheels facilitate transport to and from the site after the Turbines have served their purpose.

**Figure 2**



119   Installation required concrete foundation slabs.

120   The installation phase (which normally takes seven days) involves the installation of the ship loose components, and the installation of two large external components, the air inlet filter and exhaust stack. The installation of these components entails the removal of shipping material (such as wood packaging and plastic sheeting) in which they have been transported, the installation of gasket material on the top of the main trailer, and the rigging and hoisting (using a crane) of the air inlet filter and exhaust stack in place on the main trailer. The air inlet filter and exhaust stack are then bolted to the main trailer. Once the Turbines have been delivered and installed, the site representative issues a Certificate of Mechanical Completion. Once Mechanical Completion has been reached, they are ready to proceed to the commissioning phase (in this case Mechanical Completion of Turbines occurred on 28 October 2013 for TM033 and TM035 and on 19 November 2013 for TM036 and TM037).

121   The commissioning phase (which normally takes 14 days) involves the connection of the Turbines to external fuel sources and plumbing.

122   Decommissioning and preparing the Turbines for removal from a site involves the processes described above in reverse. The Turbines must be completely disconnected and prepared for removal. While the Turbines are in operating configuration, the part of the trailers to which the prime mover connects is removed. If the decommissioning process is not properly followed, the Turbines can be seriously damaged when they are removed. Accordingly, it is not possible to immediately remove the Turbines from the site without re-attaching the necessary parts or risking serious damage to the Turbines or the site.

123   Equipment (including spare parts) such as intakes, exhaust and air filters for the first two Turbines (designated TM033 and TM035) arrived on trucks between 12 and 17 October 2013. The main trailers were last to arrive. Forge Power had received delivery at the site of these two Turbines by 19 October 2013.

124   The second two Turbines (designated TM036 and TM037) were delivered on 9 and 10 November 2013.

125   The positioning of the main trailers on the slabs was completed on 11 November 2013.

126   The Turbines were connected via isolation valves to the fuel and water supplies on the site by removable bolts. The wheels on the Turbines remained in place.

127   The Turbines each have an in-built secure control room, the only place from where they can be operated. It is possible to divert control to a central control room, but that did not happen here.

*The Seismic & Wind Kit*

128   To ensure stability of the Turbines, they can be installed with additional equipment supplied by GE known as the "Seismic & Wind Kit".

129   Because the site is in an area which is prone to severe tropical cyclones, the Seismic & Wind Kit was installed for the Turbines.

130   Eight heavy steel cables are attached to hardware attached to each of the main and auxiliary trailers, fastened by using a clevis and bracket.

131   The Manual includes an Installation Work Package, which describes how the Seismic & Wind Kit is to be installed and removed, and contains specific provision for the installation of a used Seismic & Wind Kit.

132   The cables are fastened at the other end to studs set in concrete blocks, separate to the main concrete foundation, again by the use of clevises, which surround each Turbine. Additionally, eight turbine outrigger feet (which are different to the landing gear) are bolted on to the Turbine and then bolted to the concrete foundation using four bolts (per foot).

133   Installation of the Seismic & Wind Kits was completed on 22 October 2013 for the first two Turbines and on 17 November 2013 for the second two Turbines.

**Discussion**

134   The following factors drive the conclusion, in my opinion, that the objective intention with which the Turbines were put in place was not that they should become fixtures, but the contrary:

(1)   the Turbines were designed to be demobilised and moved to another site easily and in a short time. Significantly, the trailers keep their wheels throughout;

(2)   the Turbines were only intended to be in position on the site, which was a temporary power station site, for a rental term of two years subject to limited optional extensions;

(3)   Forge Power was contractually obliged to return the Turbines at the end of the rental term;

(4)   the Seismic & Wind Kits were to prevent damage to the Turbines during cyclonic conditions and are themselves designed to be easily removed for demobilisation and then reused at a new site;

(5)   the attachment of the Turbines to the land (via the Seismic & Wind Kits and connection to utilities) was for the better enjoyment of the Turbines as turbines, and not for the better enjoyment of the land;

(6)   removal of the Turbines would cause no damage to the land;

(7)   a design feature is that removal will not destroy or damage the Turbines;

(8)   the cost of the removal of the Turbines from the site would not exceed the value of the Turbines – it would be modest in comparison;

(9)   the Head Contract includes an express term that property in the Turbines will not pass to the owner of the land;

(10)  the Lease includes a term that the Turbines will remain at all times personal property notwithstanding that they may in any manner be affixed or attached to any other personal or real property;

(11)  Forge Power was not the owner of the site and it plainly did not intend to make a gift of the Turbines to Horizon Power; and

(12)  GE prescribed the mechanism for attachment and plainly did not intend the units to become the property of the owner of the land.

135   One feature of these proceedings worthy of mention and brought about by the way the PPSA operates is that GE was impelled (counter intuitively one might think) to argue that objectively viewed, it intended to lose its own very valuable property.

## COMMON CARRIER

136   I record that there was some debate as to the date upon which Forge Power obtained possession of the Turbines in the context of the date at which the test in s 13(2)(a) was to apply. Forge Power's position was that it obtained possession when P.T. Rolitrans International (as its carrier agent) took delivery in Houston, Texas. In a late submission, the defendants sought to contend that

P.T. Rolitrans International was a common carrier with the consequence that delivery to it did not amount to possession by Forge Power. Forge Power objected to the common carrier submission being made because it had not been pleaded and Forge Power was denied the opportunity to lead evidence which it could have led in response. There is substance in Forge Power's position, and procedural fairness would have dictated that the defendants not be permitted to take the point. However, as things transpired, it was not necessary to determine this issue because of my finding that GE was regularly engaged in the leasing of goods at all possible material times.

## CONCLUSION

137   The Lease is a PPS lease. It follows that by operation of s 267(2), the interests of any of the defendants in the Turbines vested in Forge Power immediately before the appointment of voluntary administrators on 11 February 2014 and Forge Power's right or title to, or interest in the Turbines, is superior to that of the defendants.

138   The parties are to bring in Short Minutes reflecting this outcome, and I will hear them on costs should it be necessary.

139   The exhibits are to be returned.