Court of Appeal
Supreme Court

New South Wales

| | |
|---|---|
| Case Name: | Power Rental Op Co Australia, LLC v Forge Group Power Pty Ltd (in liq) (receivers and managers appointed) |
| Medium Neutral Citation: | [2017] NSWCA 8 |
| Hearing Date(s): | 23 September 2016 |
| Decision Date: | 6 February 2017 |
| Before: | Bathurst CJ at [1];<br>Beazley P at [2];<br>Ward JA at [3] |
| Decision: | Appeal dismissed. |
| Catchwords: | PERSONAL PROPERTY SECURITIES LAW – Personal Property Securities Act 2009 (Cth) ss 8(1)(j), 10, 13(2)(a), 267 – meaning of fixtures and land in s 10 – whether lease of mobile gas turbines was a PPS lease as defined in s 13 – whether "affixed to land" in s 10 imported common law concepts or a bespoke test<br><br>REAL PROPERTY – fixtures to land – intention of parties – purpose of annexation – whether turbines connected for better enjoyment of turbines themselves or for better enjoyment of land – where lessee contractually obliged to return turbines – temporary nature of annexation – whether analogy with tenant's fixtures appropriate – degree of annexation - resting by own weight – where removal of turbines would cause no damage to land – where cost of removal does not exceed value of the turbines – where contract includes express term that property in turbines does not pass to owner of land<br><br>STATUTORY INTERPRETATION – general principles |

– use of extrinsic materials

Legislation Cited:  Building and Construction Industry Payments Act 2004 (Qld)
Chattel Securities Act 1987 (WA), ss 6, 10
Conveyancing Act 1919 (NSW), s 67
Corporations Act 2001 (Cth), s 463A
Duties Act 2008 (WA), s 3
Electricity Corporations Act 2005 (WA), s 4
Hire Purchase Act 1959 (WA), s 27
Personal Property Securities Act 2009 (Cth), ss 8, 10, 12, 13, 267, 306
Personal Property Securities Bill 2008, s 128
Personal Property Securities Bill 2009
Residential Tenancies Act 1987 (WA), ss 42, 44, 47
Stamp Act 1921 (WA), s 31B
Supreme Court Act 1970 (NSW), s 101

Cases Cited:  Agripower Barraba Pty Ltd v Blomfield (2015) 317 ALR 202; [2015] NSWCA 30
Alcan (NT) Alumina Pty Ltd v Commissioner of Territory Revenue (Northern Territory) (2009) 239 CLR 27; [2009] HCA 41
Alphapharm Pty Ltd v H Lundbeck A/S (2014) 254 CLR 247; [2014] HCA 42
Assam Railways and Trading Co Ltd v Inland Revenue Commissioners [1935] AC 445; [1934] All ER Rep 646
Attorney-General v RT Co Pty Ltd (1957) 97 CLR 147; [1957] HCA 29
Australian Provincial Assurance Co Ltd v Coroneo (1938) 38 SR (NSW) 700
Bank of Montreal v Innovation Credit Union [2010] 3 SCR 3
Bitumen and Oil Refineries (Aust) Ltd v Commissioner for Government Transport (1955) 92 CLR 200; [1955] HCA 1
Certain Lloyd's Underwriters v Cross (2012) 248 CLR 378; [2012] HCA 56
CIC Insurance Ltd v Bankstown Football Club Ltd (1997) 187 CLR 384; [1997] HCA 2
Combet v The Commonwealth (2005) 224 CLR 494; [2005] HCA 61
Commissioner of Stamps (WA) v L Whiteman Ltd (1940) 64 CLR 407; [1940] HCA 30

Commissioner of State Revenue (Vic) v Snowy Hydro Ltd (2012) 43 VR 109; [2012] VSCA 145

Commissioner of State Revenue v TEC Desert Pty Ltd [2009] WASCA 128

Commissioner of State Revenue v Uniqema Pty Ltd (2004) 9 VR 523; [2004] VSCA 82

Consolidated Edison Company of New York Inc v City of New York (1978) 44 N.Y.2d 536

Epic Energy (Pilbara Pipeline) Pty Ltd v Commissioner of State Revenue (2011) 43 WAR 186; [2011] WASCA 228

Forge Group Power Pty Limited (in liquidation) (receivers and managers appointed) v General Electric International Inc [2016] NSWSC 52

Harrison v Melhem (2008) 72 NSWLR 380; [2008] NSWCA 67

Holland v Hodgson (1872) LR 7 CP 328

IMM v The Queen (2016) 90 ALJR 529; [2016] HCA 14

J & D Rigging Pty Ltd v Agripower Australia Ltd [2015] 1 Qd R 562; [2013] QCA 406

James Hardie & Co Pty Ltd v Seltsam Pty Ltd (1998) 196 CLR 53; [1998] HCA 78

National Australia Bank Ltd v Blacker (2000) 104 FCR 288; [2000] FCA 1458

N H Dunn Pty Ltd v L M Ericsson Pty Ltd (1979) 2 BPR 9241

Nominal Defendant v GLG Australia Pty Ltd (2006) 228 CLR 529; [2006] HCA 11

Northern Territory v Collins (2008) 235 CLR 619; [2008] HCA 49

Papakosmas v The Queen (1999) 196 CLR 297; [1999] HCA 37

Permanent Trustee Australia Ltd v Esanda Corp Ltd (1991) 6 BPR 13,420

PwC Legal v Perpetual; Trustees Victoria Ltd (2007) 14 BPR 26,835; [2007] NSWCA 271

Re Australian Federation of Construction Contractors; Ex parte Billing (1987) 61 ALJR 39; [1986] HCA 74

Re Bolton; Ex parte Beane (1987) 162 CLR 514; [1987] HCA 12

Reid v Smith (1906) 3 CLR 656; [1905] HCA 54

Re Origin Energy Power Ltd v Commissioner of State Revenue (2007) 70 ATR 64; [2007] WASAT 302

|  | Saeed v Minister of Immigration and Citizenship (2010) 241 CLR 252; [2010] HCA 23 |
|---|---|
|  | Shorten v David Hurst Constructions Pty Ltd (2008) 72 NSWLR 211; [2008] NSWCA 134 |
|  | TEC Desert Pty Ltd v Commissioner of State Revenue (2010) 241 CLR 576; [2010] HCA 49 |
|  | Vopak Terminal Darwin Pty Ltd v Natural Fuels Darwin Pty Ltd (subject to a deed of company arrangement) (2009) 258 ALR 89; [2009] FCA 742 |
|  | Waller v New Zealand Bloodstock [2006] 3 NZLR 629; [2005] NZCA 254 |
|  | Wilson v State Rail Authority of New South Wales (2010) 78 NSWLR 704; [2010] NSWCA 198 |
| Texts Cited: | Jones, O, Bennion on Statutory Interpretation (6th ed, 2013, LexisNexis) |
|  | Stumbles, JH, "The PPSA: The extended reach of the definition of the PPSA security interest" (2011) 34(2) UNSW Law Journal 448 |
|  | Sykes, E and Walker, S, The Law of Securities (5th edn, 1993, Lawbook Co) |
|  | Tyler, ELG, Young PW and Croft, C, Fisher & Lightwood's Law of Mortgage (3rd Australian ed, 2010, LexisNexis) |
| Category: | Principal judgment |
| Parties: | Power Rental Op Co Australia, LLC (First Appellant) |
|  | Power Rental Asset Co Two, LLC (Second Appellant) |
|  | Forge Group Power Pty Ltd (in liq) (receivers and managers appointed) (First Respondent) |
|  | General Electric International, Inc. (Second Respondent) |
| Representation: | Counsel: |
|  | IR Pike SC with JAC Potts SC (Appellants) |
|  | JC Sheahan QC with JR Williams (First Respondent) |
|  | Solicitors: |
|  | Baker & McKenzie (Appellants) |
|  | Allens (First Respondent) |
|  | Corrs Chambers Westgarth (Second Respondent) |
| File Number(s): | 2016/00056721 |

Publication Restriction:          Nil

Decision under appeal:

  Court or Tribunal:          Supreme Court of New South Wales

  Jurisdiction:          Equity – Commercial List

  Citation:          [2016] NSWSC 52

  Date of Decision:          3 December 2015

  Before:          Hammerschlag J

  File Number(s):          2014/226778

*[Note: The Uniform Civil Procedure Rules 2005 provide (Rule 36.11) that unless the Court otherwise orders, a judgment or order is taken to be entered when it is recorded in the Court's computerised court record system. Setting aside and variation of judgments or orders is dealt with by Rules 36.15, 36.16, 36.17 and 36.18. Parties should in particular note the time limit of fourteen days in Rule 36.16.]*

## HEADNOTE

**[This Headnote is not to be read as part of the judgment]**

This judgment relates to an appeal from a decision in the Equity Division of the Supreme Court. The primary judge held that certain turbines were not fixtures for the purposes of s 10 of the *Personal Property Securities Act 2009* (Cth) (the PPSA), with the result that the lessor's unperfected security interest in the turbines vested in the lessee.

In March 2013 General Electric International Inc (GE) agreed to lease turbines to Forge Group Power Pty Ltd (Forge Power), the first respondent. In October 2013 the appellants in effect stepped into the shoes of GE as lessor.

The term of the lease commenced on 1 January 2014. On 11 February 2014 voluntary administrators were appointed to Forge Power. No financing statement had been registered on the Personal Property Securities Register established pursuant to the PPSA in respect of GE's interest, as lessor, in the turbines. Accordingly, the security interest remained unperfected.

In August 2014 Forge Power commenced proceedings in the Supreme Court. Forge Power sought relief including declarations that, by operation of s 267(2) of the PPSA, the unperfected security interest of GE and/or the appellants in the turbines had vested in it as lessee immediately before the appointment of the voluntary administrators and therefore that its right or title to or interest in the turbines was superior to that of GE and the appellants.

At first instance, the ultimate question was whether the PPSA was engaged. It was accepted that if it was Forge Power would succeed. The PPSA was engaged if the lease was a PPS lease. That question turned on whether GE was regularly engaged in the business of leasing goods within the meaning of s 13(2)(a) of the PPSA and whether the turbines had become fixtures within the meaning of s 10 of the PPSA when installed on the site.

The primary judge held that GE was regularly engaged in the business of leasing goods within the meaning of s 13(2)(a) of the PPSA. This finding was not challenged on appeal. The primary judge also held that the words "affixed to land" in the definition of "fixtures" in s 10 of the PPSA meant affixed according to common law concepts and that the turbines had not become fixtures. This finding was challenged on appeal.

On appeal, the appellants advanced two lines of argument. First, that the definition of "fixtures" in the PPSA did not import well-known common law concepts but instead adopted a bespoke definition in which affixation was the only relevant criterion. Correct application of that test, it was argued, should have resulted in a finding that the turbines had become fixtures. Secondly, and alternatively, if the definition of "fixtures" did involve common law concepts, the primary judge failed (or failed sufficiently) to take into account the purpose of affixation, the temporary nature of the affixation, and the physical characteristics of the turbines.

*Held*, dismissing the appeal (Ward JA; Bathurst CJ and Beazley P agreeing at [1] and [2], respectively):

*As to grounds 1-3:*

(1)     (at [105]) Based on certain textual and contextual indicators (referred to at [103]), and the clear legislative intent discernible from the extrinsic

material (referred to at [44]-[49]) the primary judge's conclusion that the definition of "fixtures" in s 10 of the PPSA was intended to import common law notions of affixation was correct.

(2)   (at [105]; [106]) In light of the conclusion reached above, ground 3 did not arise; (*obiter*) had the correct test been one of non-trivial physical affixation to land alone, one would be driven to the common law test for a fixture at least insofar as that relates to the nature and degree of annexation of the goods to the land, further, had the test of affixation been one as to the substance or enduring nature of the affixation, the reversible nature of the attachment and the reusable nature of the turbines indicated that the turbines did not become fixtures for the purposes of PPSA.

*As to grounds 4-5:*

(3)   (at [141]) The primary judge did not fail to take into account, or fail sufficiently to take into account: the physical characteristics of the turbines; the purpose of affixation; or the "temporary" nature of the affixation.

(4)   (at [144]; [145]) Although the primary judge did not expressly address the significance of the pipeline connections when concluding that the turbines were installed for the better enjoyment of the turbines themselves and not for the better enjoyment of the land, the nature and degree of the affixation in question was not so substantial or enduring as to warrant a finding (when weighed with the other relevant factors) that the turbines thereby became fixtures.

(5)   (at [147]; [150]) The "temporary" purpose of affixation is not an irrelevant consideration. Here, there was ample evidence that the turbines were installed for a temporary purpose. This supported the conclusion that objectively they were not intended to become part of the land.

(6)   (at [157]) Accordingly, the primary judge did not err in concluding that the turbines did not become fixtures in the common law sense.

## JUDGMENT

1   **BATHURST CJ**: I agree with Ward JA.

2   **BEAZLEY P**: I have had the advantage of reading in draft the reasons of Ward JA. I agree with her Honour's reasons and proposed orders.

3   **WARD JA**: This appeal involves a dispute as to which of competing entities (those standing in effect in the position of lessor and lessee, respectively) has the superior title to or interest in four mobile gas turbine generators (the Turbines) used for the purposes of the construction, operation and maintenance of a power station at Port Hedland in Western Australia. That question turns on the proper construction of the definition of "fixtures" in the

*Personal Property Securities Act 2009* (Cth) (the PPSA) and whether, on that construction, the Turbines became "fixtures" when installed at the power station.

4    The Turbines were leased by the second respondent, General Electric International Inc (GE), to the first respondent, Forge Group Power Pty Ltd (Forge Power), pursuant to an agreement entered into in March 2013 (the Lease). Forge Power is now in liquidation and receivers and managers have been appointed.

5    The appellants, Power Rental Op Co Australia, LLC (OpCo) and Power Rental Asset Co Two, LLC (AssetCo), effectively acquired the benefit of the Lease in October 2013, when GE sold what was described as its "large scale, long-term, temporary power generation rental business" to the appellants' holding company, APR Energy Plc (APR). It was not in dispute that when this happened the appellants in effect stepped into the shoes of GE as lessor of the Turbines. (GE has filed a submitting appearance in this appeal.)

6    Voluntary administrators were appointed to Forge Power on 11 February 2014. As at that time, no financing statement had been registered on the Personal Property Securities Register established pursuant to the PPSA in respect of GE's interest, as lessor, in the Turbines. In those circumstances, if (as the primary judge found) the Lease was a lease to which the PPSA applied then, by operation of s 267(2) of that Act, GE's unperfected security interest (as lessor) in the Turbines vested in Forge Power immediately prior to the voluntary administrators' appointment and, as the primary judge held, Forge Power's right or title to, or interest in, the Turbines was superior to that of GE (*Forge Group Power Pty Limited (in liquidation) (receivers and managers appointed) v General Electric International Inc* [2016] NSWSC 52 at [137]).

7    The conclusion that the Lease was a PPS Lease, within the meaning of s 13(1) of the PPSA, turned on the primary judge's findings: first, that from 2003 GE had been regularly engaged in the business of leasing the goods (at [72]) (which meant that the exclusion from the definition of "PPS Lease" in s 13(2)(a) of the PPSA was not engaged); and, second, that the Turbines were not

"fixtures" for the purposes of the PPSA (at [75]) (which meant that the exclusion in s 8(1)(j) was not engaged).

8    There is no challenge to the first of those findings. Rather, this appeal (brought as of right pursuant to s 101 of the *Supreme Court Act 1970* (NSW)) turns on whether the primary judge was correct in concluding that when installed at the Port Hedland power station the Turbines did not become fixtures, within the meaning of that term as used in the PPSA.

9    The appellants contend that the effect of his Honour's decision is to confer a windfall gain in the order of some US$44 million on Forge Power, that being the accepted value of the Turbines. The Turbines themselves remain installed at the Port Hedland power station. If successful, the appellants will recover the monetary sum into which the Turbines have been notionally converted. They do not seek any orders for costs either of the appeal or the proceedings at first instance.

10   For the reasons below, I am of the opinion that the appeal should be dismissed.

**Background**

*DBOM*

11   On 23 January 2013, Forge Power, as contractor, entered into a Design, Build, Operate and Maintain Contract (the DBOM) with Regional Power Corporation, a statutory body established under s 4(1)(d) of the *Electricity Corporations Act 2005* (WA), trading as Horizon Power. As its title indicates, the contract was for the design, construction, operation and maintenance of "the Plant", which was defined, relevantly, as "the South Hedland Temporary Power Station (including the Contractor Materials & Equipment) …". The term "Contractor Materials & Equipment" was defined by reference to the materials and equipment identified in Schedule 28 to the DBOM.

12   Forge Power was to carry out the construction of the "Works" and perform the "Services" for Horizon Power in accordance with the DBOM. The Scope of Work (Schedule 3 to the BDOM) contemplated the lease of gas turbine generators for a fixed term (cl 1.1) and specified the GE TM2500 GTG units (the model of the turbines the subject of the present proceedings). The Scope

of Work also provided that the generator turbines were to be provided by the contractor (i.e., Forge Power) on a lease basis.

13   On the End Date (defined as 31 December 2015 but with options to extend pursuant to cll 19.2 and 19.3 of the DBOM) or any earlier date of termination of the DBOM, there was to be a handover to Horizon Power of the Plant, excluding the Contractor Materials & Equipment save to the extent that they comprised "Sale Assets" (cl 30 of the DBOM). It was not in dispute that the Turbines were not to form part of the assets to be acquired by Horizon Power on completion of the Works or on the "Handover Date".

14   Clause 21 of the BDOM dealt with the supply of electricity. Upon commencement of the O&M (Operation & Maintenance) Phase until the End Date, Forge Power was obliged to make available to Horizon Power electricity generated by the Plant up to the Contract Capacity at all times and to deliver it (in accordance with the Power Quality Standards and Dispatch Instructions) to Horizon Power at the Delivery Point (defined as "the LV terminals of the 220/11kV 50/60 MVA Generator Step Up Transformers").

15   As already noted, the term "Plant" was defined by reference to the so-named "[t]emporary" power station. It was, however, contemplated that Horizon Power might in the future construct a permanent power generation facility on adjacent land.

*The Lease*

16   On 5 March 2013, Forge Power entered into the Lease with GE (a company incorporated in Delaware in the United States of America and registered as a foreign company doing business in Australia since 1995). Pursuant to the Lease, Forge Power agreed to rent the Turbines (there described as four mobile electricity generating GE TM2500+ gas turbines) from GE for a rental term of two years, commencing on 1 January 2014 and ending on 31 December 2015, subject to extension pursuant to Art 10 of the Lease (Art.1; Art. 9). There was provision for the rental term to commence according to a specified schedule on a later date in certain circumstances (Art. 9). The rental price for the two year term was US$28,662,706.

17    Article 9 of the Lease confirmed the parties' intent that the rental of the Turbines pursuant to the agreement "shall be a true lease and not a sale or financing transaction".

18    Article 1 obliged GE to provide the equipment "suitable for connection to the local interconnected system" subject to scopes and exceptions described in Attachment 1 to the Lease and acknowledged by Forge Power. GE was also to provide services to Forge Power as described in Attachment 1, Section II, Services (Art. 2). Those services included the installation, commissioning and demobilisation of the Turbines (Art. 4). The fee for those services was US$4,598,294.

19    Forge Power was responsible for transportation of the Turbines, spare parts and "initial consumables" (Art. 5) from GE's facility in Texas to the site at South Hedland. (A short DVD showing the mode of transportation of the Turbines and their arrival on site was viewed by the Court. Suffice it for present purposes to note that the Turbines were, and at all relevant times remained, mounted on trailers and, on arrival in Australia, were transported, with associated equipment on interconnected trailers, by over-sized prime movers.)

20    Article 13 of the Lease provided that Forge Power was responsible for ensuring the prompt and timely return of the equipment to GE. Article 14 provided that the Turbines were at all times to be and remain solely and exclusively the property of GE or its affiliates and that no right, title or interest in them was to pass to Forge Power other than the right of Forge Power ("conditioned on" Forge Power's compliance with and fulfilment of the terms and conditions of the contract) to maintain possession and use as described in the contract for the rental term. Article 14 also provided that the Turbines were at all times to remain personal property "notwithstanding that the Rented Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to any other personal or real property".

*Sale of GE's temporary power generation rental business*

21    On 22 October 2013, GE sold its temporary power generation rental business to APR. Shortly thereafter, on 27 October 2013, GE assigned the benefit of the Lease to OpCo (APR's wholly-owned subsidiary, which was incorporated in

Delaware and registered as a foreign company doing business in Australia since 19 December 2013). Also on that date, GE assigned title to the Turbines to AssetCo (another wholly-owned subsidiary of APR incorporated in Delaware). (The appellants do not assert that the transfers from GE to AssetCo and OpCo relevantly affect the outcome of this case and have proceeded on the basis that their rights are no different to any rights that would have remained vested in GE but for the sale transaction from GE to APR.)

*Installation and commissioning of Turbines*

22    A description of the delivery, installation and commissioning process (and decommissioning process) generally applicable to turbines of this kind was given by Mr Steven Burdick, GE's site manager at the Port Hedland site at the relevant time, in his affidavit of 6 March 2015 (at [13]-[32]).

23    The primary judge's description of the installation process, by reference to the evidence, including the Installation and Commissioning Manual, was as follows (at [111]-[116]):

> The Manual describes the Turbines as comprising trailers that contain the gas turbine generator, air filtration and exhaust equipment, fuel systems, switch gear, lubricating systems, fire protection equipment, and auxiliary systems. There are two trailers, a main trailer which carries and houses the Turbine in a turbine enclosure, the Generator and switch gear. The auxiliary trailer carries and houses a control house, cooling system, auxiliary skid, and generator exhaust silencer.
>
> The Turbines may be configured in one of two configurations. They may be either installed at a site, and configured as an operating generator, or in a transport configuration, in which the Turbine comprises two very large trailer units, together with several flat-bed truckloads of support equipment (described as ship loose).
>
> When in the transport configuration, each of the two trailer units can be towed on a normal road by an oversized prime mover or semi-trailer truck.
>
> The main trailer contains the bulk of the machinery, including the gas turbine, the electric generator and associated systems, and weighs approximately 75 metric tonnes. In its installed configuration, the main trailer is 21,305 mm long, 3,124 mm wide and 9,363 mm high. In its transport configuration, the main trailer is 33,825 mm long, 3,124 mm wide and 4,172 mm high. The auxiliary trailer contains the auxiliary support systems, various pumps, and a control room. The auxiliary trailer weighs approximately 27 metric tonnes. In both the transportation and installed configurations, the auxiliary trailer is 14,496 mm long, 2,591 mm wide and 4,000 mm high. Accordingly, the total weight of a turbine is approximately 102 metric tonnes. The dimensions of a Turbine, in its installed configuration, are approximately 21,305 mm long, 6715 mm wide and 9,363 mm high.

There are manufacturer's specifications for the surface on which the Turbines will be put. A concrete foundation is optional, because they can be parked on flat ground. If there is no concrete foundation, then it is necessary for the earth to be levelled and compacted. The site for installation requires careful preparation for the Turbines to be operated safely and properly.

On arrival at the site, the prime mover positions the Turbines in the desired position on the foundation at the site. Then, the trailers are lowered and stabilised by eight so-called landing gear mounted on each trailer, which have telescoping feet hand-cranked until they make contact with the ground or foundation on which the Turbines are positioned. The landing gear rest on spacers (metal pedestals that sit between the landing gear and the ground or foundation). Once the stabilising is complete, the prime mover will disconnect from the trailers.

24    Neither party cavils with that description as such (though the appellants contend that the primary judge failed, or failed sufficiently, to take into account aspects of the physical characteristics and annexation of the Turbines).

25    The Turbines were transported in two batches. Mr Burdick explained that the receiving and inspection at the Port Hedland site of the first two Turbines (TM33 and TM35) commenced on about 12 October 2013 and of the second two Turbines (TM36 and TM37) commenced on about 9 November 2013 ([33]-[34] of his affidavit). Although, as Mr Burdick explained, a concrete foundation for "the surface on which the Turbines will be staged" was optional ("because the packages can be parked on flat ground"), in the present case concrete slabs had been laid for each of the Turbines.

26    Once delivered to the site, the process first of installation and then of commissioning of the Turbines was able to commence. The former involved the installation of the trailers on the concrete slabs and the installation of the air intake filter and exhaust stack in respect of each Turbine; the latter involved the connection of the Turbines to external fuel sources and plumbing.

27    The primary judge described the installation process (at [120]) as follows:

The installation phase (which normally takes seven days) involves the installation of the ship loose components, and the installation of two large external components, the air inlet filter and exhaust stack. The installation of these components entails the removal of shipping material (such as wood packaging and plastic sheeting) in which they have been transported, the installation of gasket material on the top of the main trailer, and the rigging and hoisting (using a crane) of the air inlet filter and exhaust stack in place on the main trailer. The air inlet filter and exhaust stack are then bolted to the main trailer. …

28      At [128]-[129], his Honour noted that, to ensure stability of the Turbines, they could be installed with additional equipment supplied by GE known as the "Seismic & Wind Kit". Mr Burdick explained that Forge Power requested the Seismic & Wind Kit for each of the Turbines because Port Hedland is in cyclone territory (at [44]). His Honour described the installation process for the Seismic & Wind Kits as follows (from [130]-[132]):

> Eight heavy steel cables are attached to hardware attached to each of the main and auxiliary trailers, fastened by using a clevis and bracket.
>
> The Manual includes an Installation Work Package, which describes how the Seismic & Wind Kit is to be installed and removed, and contains specific provision for the installation of a used Seismic & Wind Kit.
>
> The cables are fastened at the other end to studs set in concrete blocks, separate to the main concrete foundation, again by the use of clevises, which surround each Turbine. Additionally, eight turbine outrigger feet (which are different to the landing gear) are bolted on to the Turbine and then bolted to the concrete foundation using four bolts (per foot). (See also Mr Burdick's explanation at [45].)

29      Installation of the Seismic & Wind Kits required the use of a 50 tonne crane. In lay terms, the Seismic Kit is "epoxied" into bolts protruding out of the concrete foundation (the outriggers and rear support pedestals) and then bolted to the main trailer on which the Turbine sits. The Wind Kit is attached with guy wires to the Turbine by a hooking mechanism; the cables or wires being attached to anchor plates bolted on the concrete slab. Installation of the Seismic & Wind Kits (except for tensioning of the steel cables, which was completed separately) was completed on or about 22 October 2013 for the first two Turbines and on or about 17 November 2013 for the second two Turbines (see [46] of Mr Burdick's affidavit).

30      Mr Burdick gave evidence that the installation of the first two Turbines took 16 days; that of the second two Turbines took 13 days. The primary judge noted (at [120]) that once the Turbines were delivered and installed the site representative issued a Certificate of Mechanical Completion. Mechanical Completion was certified on 28 October 2013 for TM33 and TM35; and on 19 November 2013 for TM36 and TM37.

31      The commissioning process then commenced. Although this would normally take 14 days, it took around three to three and a half months in the present case. Mr Burdick explained that this was due to "delays with availability of the

customer's 'balance of plant' for the Turbines" (namely, the supply of liquid fuel, de-mineralised water and back-feed for the Turbines) (see his affidavit at [36]-[37]).

32      Mr Burdick also explained in his affidavit that the Turbines, though their function is to generate electricity, need to be connected to an electrical power source prior to starting their operation. He said that, in the commissioning phase, the Turbines are connected to "external fuel sources, plumbing and the customer's site generally" (at [26]). The key connections were described by him (at [26]) as being electrical connections and fuel connections, as follows:

> (a)  **Electrical connections**
>
> (i)  **11.5 kV connection**: This is the 11.5 kilovolt output connection from the generator, and is connected to the customer's balance of plant for on-connection to the electricity grid.
>
> This connection is made by bolting 6 large conductors onto copper busbars.
>
> (ii)  **Auxiliary connection**: This is a 400 volt power supply to the auxiliary trailer, which is made in the same manner (i.e., by bolting conductors onto copper busbars) as the 11.5 kV connection. This power supply is necessary in order to operate the auxiliary parts of the Turbines, such as the control room and pumps.
>
> (iii)  **Low voltage customer interconnections**: These involve the connection of 6 low-voltage conductors to the auxiliary trailer. The connections are made by connecting wires to screw-type connectors.
>
> (b)  **Fuel connections**
>
> (i)  **Gas**: This is for the supply of natural gas fuel. This connection is hard-piped, and is made by bolting together flanges on connecting pipes.
>
> (ii)  **Diesel**: This is for the supply of No.2 diesel fuel. This connection is made in the same manner as the gas connection described above.
>
> (iii)  **Demineralised water**: This is for the supply of demineralised water, which is necessary because town water is unsuitable for use in the Turbines. This connection is made in the same manner as the gas connection described above.

33      Electricity generated by the Turbines is delivered by means of the first of the electrical connections referred to above to the power station's electricity grid.

34      The primary judge noted (at [126]) that the Turbines were connected via isolation valves to the fuel and water supplies on the site by removable bolts and (at [127]) that each Turbine had an in-built secure control room, which in the present case was the only place from where they could be operated (since,

although it was possible to divert control to a central control room, that did not happen at Port Hedland).

35    The decommissioning process, as described by the primary judge at [122], was essentially the reverse of the above processes:

> Decommissioning and preparing the Turbines for removal from a site involves the processes described above in reverse. The Turbines must be completely disconnected and prepared for removal. While the Turbines are in operating configuration, the part of the trailers to which the prime mover connects is removed. If the decommissioning process is not properly followed, the Turbines can be seriously damaged when they are removed. Accordingly, it is not possible to immediately remove the Turbines from the site without re-attaching the necessary parts or risking serious damage to the Turbines or the site.

36    In summary, therefore, the Turbines (each of which weighed approximately 102 metric tonnes and, in its installed configuration, was approximately 21,305mm long, 6715mm wide and 9,363mm high – see Mr Burdick's affidavit at [18]), each remaining mounted on the main trailer on which it was transported to the site, were each positioned on a concrete slab foundation sitting on top of metal pedestals via "landing gear" that was lowered from the trailers. Mr Burdick described the "landing gear" (eight of which were mounted on each trailer) as "telescoping feet which are hand-cranked until they make contact with the ground or foundation" on which the Turbine is positioned. The landing gear rest on "pacers" (metal pedestals that sit between the landing gear and the ground or foundation). Once stabilised, the prime mover disconnects from the trailers. (See Mr Burdick's affidavit at [20].) There is no physical affixation of the landing gear or pedestals to the concrete slab (T 23.42); rather, they rest on their own weight.

37    The relevant affixation to the land (for the purposes of the appellants' argument that the Turbines are fixtures as defined under the PPSA) is twofold: the appellants point both to the physical connection of the Turbines to the pipelines or conductors (described at [32] above), through some of which electricity is to be delivered to the power station's electricity grid, and to the physical connection of the Turbines to the Seismic & Wind Kits (described at [29] above), by which the Turbines are stabilised against potential cyclone activity in the region.

*Appointment of voluntary administrators and commencement of proceedings*

38    The "Rental Term" commenced, in accordance with Art 9 of the Lease, on
      1 January 2014. It was only very shortly thereafter, on 11 February 2014, that
      voluntary administrators were appointed to Forge Power pursuant to s 463A of
      the *Corporations Act 2001* (Cth). On 18 March 2014 Forge Power went into
      liquidation.

39    Pursuant to Art 12.6 of the Lease, GE had the right to terminate the contract for
      cause on the happening of various insolvency events, subject to the provisions
      of that article. On 26 February 2014, GE (with the consent of the appellants)
      terminated the Lease. Demand was made on Forge Power for amounts in
      excess of US$18 million (comprising payments due on termination and other
      amounts due in respect of rental). Payment of the amounts so demanded was
      not made. Instead, Forge Power's receivers and managers informed GE (and
      the appellants) on 26 February 2014 that Forge Power claimed title to the
      Turbines by virtue of the PPSA.

40    Proceedings were commenced by Forge Power in the Commercial List of the
      Equity Division of the Supreme Court by summons filed on 1 August 2014.
      Forge Power sought relief including declarations that, by operation of s 267(2)
      of the PPSA, the interest of GE and/or the appellants in the Turbines had
      vested in it immediately before the appointment of the voluntary administrators
      and that its right or title to or interest in the Turbines was superior to that of GE
      and the appellants.

**PPSA**

41    Before turning to the primary judge's reasons, it is convenient to set out the
      relevant statutory provisions and some explanation of the priorities scheme for
      security interests that was introduced in the PPSA, an Act that has been
      recognised as radically changing the definition or conceptualisation of security
      interests (see JH Stumbles, "The PPSA: The extended reach of the definition
      of the PPSA security interest" (2011) 34(2) *UNSW Law Journal* 448). As
      Professor Stumbles explains, the need for a re-conceptualisation of security
      interests in relation to personal property arose because of the "disparate and
      illogical technicality associated with the creation and recording of security

interests over personal property, together with the gaps produced by that technicality" (Stumbles, ibid, at 449).

42    The PPSA provides "default rules" for the creation, priority and enforcement of security interests in personal property (as explained when the Bill was before the House of Representatives in 2009; see Commonwealth, *Parliamentary Debates*, House of Representatives, 24 June 2009). Once the provisions of the PPSA are engaged, priority is determined by reference to those rules without regard to title (Stumbles, ibid, at 453, there referring to the observations of the Canadian Supreme Court in *Bank of Montreal v Innovation Credit Union* [2010] 3 SCR 3 at [19] in this regard).

43    Thus the appellants' complaint that there has been a "windfall gain" in the present case is not to the point. Any such windfall gain is simply a result that flows from the operation of the legislation as a consequence of the fact that GE's security interest in the Turbines was not perfected by registration on the PPS register at the relevant time.

44    The initial Consultation Draft of the Personal Property Securities Bill 2008 (published on 16 May 2008) included "fixtures" within the then proposed PPS regime. Clause 128 of that draft bill provided that:

> **128 Scope of this Subdivision**
>
> This subdivision sets out the priority between any interest (whether or not a security interest) in land and a security interest in tangible property (the fixture) that is affixed to land.

45    The commentary to the Bill issued in May 2008 spoke (at [8.10]) of the then current law on "fixtures" financing as complex and uncertain, noting that it did not in many circumstances "provide the desired clarity and protection for security interest holders" and that commentators had described this area as "anachronistic" and a "maze if not a minefield". At [8.11] it was said that the Bill included provisions designed to rectify this, seeking to balance existing and subsequent interests in the land to which the fixture becomes or is affixed and the interest of the fixtures creditor. The then proposed introduction (in Div 2 of Pt 8 of the Bill) of priority rules between security interests in fixtures and interests in land was said to be with the aim of making fixtures financing in Australia "more accessible and less risky" ([8.12]).

46   At [8.13], it was noted that the Bill referred to a fixture as tangible property that is affixed to land (s 128) and that this was "consistent with the common law doctrine of fixtures", the commentary going on to say (at [8.14]) that, at common law, a fixture is an item of tangible personal property that is annexed to real property in such a way as to become a part of the real property and that whether an item is a fixture "*depends on the degree and purpose of annexation of the item* as well as the rebuttable presumption that what is fixed to land is a fixture and that which is not remains a chattel" [my emphasis].

47   Pausing there, it is clear from the commentary to the May 2008 draft Bill that the concept of "fixture" then understood as being within the proposed PPS regime was that of a fixture as that would be understood in accordance with common law principles (requiring a determination not only of the degree of annexation of the item but also its purpose).

48   The subsequent Exposure Draft of the Bill dated 10 November 2008 removed the provision for fixtures to be treated as part of the PPS regime. Referring to "[k]ey issues addressed or removed from the PPS Bill", the revised commentary issued in December 2008 noted that concern had been indicated about the interaction between the Bill and State and Territory laws "particularly in relation to licences and land title law" (at B.2) and that the Bill no longer contained priority provisions dealing with fixtures (at B.4). According to the publication of the Senate Standing Committee on Legal and Constitutional Affairs in March 2009 as to the 2008 Exposure Draft (at [2.44]) this change was at the request of the States that the draft bill not apply to "tradable water rights … or tangible property that is affixed to land, nor to fixtures". (Pausing there, it seems a distinction was there drawn between tangible property affixed to land in such a way that it did not become a fixture at common law and tangible property affixed to land in such a way that it did - the request being that neither be subject to the PPS regime.)

49   The express exclusion of "fixtures" from the PPS regime in the Personal Property Securities Bill 2009 was referred to by the then Attorney-General in the Second Reading Speech to the Bill as follows (see Commonwealth, *Parliamentary Debates*, House of Representatives, 24 June 2009 at 6963):

> All kinds of personal property will be covered by the bill, subject to some very limited exceptions such as fixtures and water rights.
>
> Those kinds of property have been excluded as there are existing schemes in place to deal with security interests in those areas

50   Forge Power submits that the reference to "existing schemes in place to deal with security interests" in relation to fixtures in the Second Reading Speech must be taken as being a reference to the then existing State legislation in the context of priorities between security interests over fixtures. It points out that in legislation in force at the time of the second reading speech, such as s 67 of the *Conveyancing Act 1919* (NSW); ss 6 and 10 of the *Chattel Securities Act 1987* (WA); ss 42, 44 and 47 of the *Residential Tenancies Act 1987* (WA); s 31B of the *Stamp Act 1921* (WA); and s 27 *Hire Purchase Act 1959* (WA), there is no definition of fixtures, submitting that the legislature in those instances is relying on the common law meaning of that term.

51   Turning then to the legislation as ultimately enacted, s 267 of the PPSA relevantly provides for the vesting of unperfected security interests in the grantor (that term being defined in s 10 as including a lessee under a PPS lease – here, Forge Power) upon the grantor's winding up or bankruptcy in the following circumstances:

> **Vesting of unperfected security interests in the grantor upon the grantor's winding up or bankruptcy etc.**
>
> *Scope*
>
> (1)  This section applies if:
>
> (a)  any of the following events occurs:
>
> …
>
> (ii)  an administrator of a company or a body corporate is appointed (whether under section 436A, 436B or 436C of the *Corporations Act 2001*, under that section as it is applied by force of a law of a State or Territory, or otherwise);
>
> …
>
> (b)  a security interest granted by the body corporate, company or bankrupt is unperfected at whichever of the following times applies:
>
> …
>
> (ii)  in the case of any other company or body corporate—when, on a day, the event occurs by virtue of which the day is the section 513C day for the company or body, within the meaning of the *Corporations Act 2001* (including that Act as it is applied by force of a law of a State or Territory, or otherwise);
>
> …

(2)   The security interest held by the secured party vests in the grantor immediately before the event mentioned in paragraph (1)(a) occurs.

…

52      Security interest is defined in s 12 as:

**Meaning of *security interest***

(1)   A *security interest* means an interest in personal property provided for by a transaction that, in substance, secures payment or performance of an obligation (without regard to the form of the transaction or the identity of the person who has title to the property).

(2)   For example, a *security interest* includes an interest in personal property provided by any of the following transactions, if the transaction, in substance, secures payment or performance of an obligation:

…

(i)   a lease of goods (whether or not a PPS lease);

…

(3)   A security interest also includes the following interests, whether or not the transaction concerned, in substance, secures payment or performance of an obligation:

…

(c)   the interest of a lessor or bailor of goods under a PPS lease.

…

53      The term "PPS lease" is defined in s 13 as:

**Meaning of *PPS lease***

(1)   A *PPS lease* means a lease or bailment of goods:

(a)   for a term of more than one year; or

(b)   for an indefinite term (even if the lease or bailment is determinable by any party within a year of entering into the lease or bailment); or

(c)   for a term of up to one year that is automatically renewable, or that is renewable at the option of one of the parties, for one or more terms if the total of all the terms might exceed one year; or

(d)   for a term of up to one year, in a case in which the lessee or bailee, with the consent of the lessor or bailor, retains uninterrupted (or substantially uninterrupted) possession of the leased or bailed property for a period of more than one year after the day the lessee or bailee first acquired possession of the property (but not until the lessee's or bailee's possession extends for more than one year).

(2)   However, a *PPS lease* does not include:

(a)   a lease by a lessor who is not regularly engaged in the business of leasing goods;…

54     As noted, there is no challenge to the primary judge's finding that GE was
       regularly engaged in the business of leasing goods and hence that the
       exclusion in s 13(2)(a) did not apply. Nor is there any dispute that the security
       interest in the present case was unperfected at the relevant date. The crux of
       the dispute lies in the fact that s 8(1)(j) provides, relevantly, that the PPSA
       does not apply to an interest in a fixture.

55     "Fixtures" are defined in s 10 as:

          *fixtures* means goods, other than crops, that are affixed to land.

56     Other relevant definitions in s 10 are:

          *accession* means ...goods that are installed in, or affixed to, the other
          goods…

          *general law* means the principles and rules of the common law and equity.

          *goods* means personal property that is tangible property, including …

          ...

          *land* includes all estates and interests in land, whether freehold, leasehold, or
          chattel, but does not include fixtures.

          …

          *personal property* means property (including a licence) other than:

          (a)  land; ...

**Primary judgment**

57     As adverted to earlier, his Honour's reasoning as to whether the Turbines
       became fixtures for the purposes of the PPS regime, when
       installed/commissioned at the power station, addressed two issues: first, the
       test to be applied in determining, for the purposes of the definition of fixtures in
       s 10 of the PPSA, whether a good is "affixed to land"; and, second, whether the
       Turbines had become affixed to the land.

58     As to the first, at [73] the primary judge recorded the parties' competing
       contentions: namely, that Forge Power had contended that the common law
       test of affixation applied, as reflected in the maxim *quicquid plantatur solo, solo
       cedit* (namely, that whatever is affixed to the ground belongs to the ground);
       and that GE and the Power Rental entities (here, the appellants) had
       contended, on the other hand, that the definition in s 10 introduced a bespoke
       meaning of "affixed to land".

59      Both before the primary judge and on appeal, the appellants argue that all that
        is required for the PPSA definition is that there be a "non-trivial attachment" to
        the land, involving the notion of something "affixed in a way that couldn't be
        easily removed" (see AT 9.23). Relevantly, they contend that the purpose of
        affixation (and whether it is to be permanent or temporary) is irrelevant when
        determining whether the item is a "fixture" under the PPSA.

60      As to the first issue, his Honour held (at [75]) that the words "affixed to land" in
        the statutory definition of fixtures meant affixed according to common law
        concepts. His Honour (having pointed to but then expressly leaving aside the
        difficulty of ascribing meaning to the notion of "non-trivial") noted that one of the
        critical demarcation lines underpinning the operation of the PPSA was that
        between personal property and land. His Honour considered that the
        application of the common law definition of affixation accorded with that
        demarcation because goods affixed, according to common law concepts,
        become part of the land (at [77]-[78]).

61      As to the second issue, his Honour referred to the applicable principles under
        the common law as settled and said (at [79]):

>       Whether an item has become a fixture depends upon the objective intention
>       with which the item was put in place, having regard to the degree and object of
>       annexation, but each case depends on its own circumstances: *Agripower v
>       Blomfield* [2015] NSWCA 30 at [74]–[81]; (2015) 317 ALR 202.

62      His Honour noted (at [82]-[83]) the factors identified by Conti J in *National
        Australia Bank Ltd v Blacker* (2000) 104 FCR 288; [2000] FCA 1458 at [13]-[14]
        as those that the courts generally ought to take into account in determining the
        purpose or object and degree of annexation (factors referred to by Sackville
        AJA in *Agripower Barraba Pty Ltd v Blomfield* (2015) 317 ALR 202; [2015]
        NSWCA 30 at [81] as useful guides but neither exhaustive nor definitive). It is
        convenient here to reproduce the considerations listed by Conti J in *Blacker* (at
        [13]-[14]) in full:

>       Purpose of Annexation.
>
>       In determining the purpose or object of annexation, a variety of considerations
>       may be taken into account. The Court ought as a general rule to have regard
>       to:
>
>       ● Whether the attachment was for the better enjoyment of the property
>       generally or for the better enjoyment of the land and/or buildings to which it

was attached: see *Hobson v Gorringe*, supra at 190; *Leigh v Taylor* [1902] AC 157 at 158; *Reid v Smith*, supra at 680-681; *Litz v National Australia Bank Ltd* (1986) Qld Conv R54-229 at 57,550.

● The nature of the property the subject of affixation: *Metal Manufacturers Ltd v FCT*, supra at 411.

● Whether the item was to be in position either permanently or temporarily: *Australian Provincial Assurance Co Ltd v Coroneo*, supra at 712-713.

● The function to be served by the annexation of the item: see for example *A-G (Cth) v R T Co Pty Ltd (No 2)* (1957) 97 CLR 146 at 156-157 where printing presses were secured to a concrete foundation by nuts and bolts in order to keep the printing presses steady when in operation.

The Degree of Annexation

In determining the degree of annexation, the Court may consider the following:

● Whether removal would cause damage to the land or buildings to which the item is attached: see *Hellawell v Eastwood* (1851) 6 Ex 295 at 312; 155 ER 554 at 561; *Adams v Medhurst & Sons Pty Ltd* (1929) 24 Tas LR 48 at 49; *Spyer v Phillipson* [1931] 2 Ch 183 at 209-210.

● The mode and structure of annexation: *Leigh v Taylor*, supra at 162; *Teaff v Hewitt 1 Ohio St.*, 511 referred to by Griffith CJ in *Reid v Smith,* supra at 667; *Boyd v Shorrock* (1867) LR 5 Eq 72 at 78.

● Whether removal would destroy or damage the attached item of property: *Litz v National Australia Bank Ltd*, supra at 57,549.

● Whether the cost of renewal would exceed the value of the attached property: *Metal Manufactures Ltd v FCT*, supra at 411.

63   At [134], having referred to various provisions of the Lease and having described the process of transportation, installation, commissioning and (the yet to occur) de-commissioning of the Turbines, including the installation of a Seismic & Wind Kit to each of the Turbines, the primary judge listed 12 factors that had led him to conclude that the objective intention with which the Turbines were put in place was not that they should become fixtures, those being:

> 1.   the Turbines were designed to be demobilised and moved to another site easily and in a short time. Significantly, the trailers keep their wheels throughout;
>
> 2.   the Turbines were only intended to be in position on the site, which was a temporary power station site, for a rental term of two years subject to limited optional extensions;
>
> 3.   Forge Power was contractually obliged to return the Turbines at the end of the rental term;
>
> 4.   the Seismic & Wind Kits were to prevent damage to the Turbines during cyclonic conditions and are themselves designed to be easily removed for demobilisation and then reused at a new site;

5.   the attachment of the Turbines to the land (via the Seismic & Wind Kits and connection to utilities) was for the better enjoyment of the Turbines as turbines, and not for the better enjoyment of the land;

6.   removal of the Turbines would cause no damage to the land;

7.   a design feature is that removal will not destroy or damage the Turbines;

8.   the cost of the removal of the Turbines from the site would not exceed the value of the Turbines – it would be modest in comparison;

9.   the Head Contract includes an express term that property in the Turbines will not pass to the owner of the land;

10.   the Lease includes a term that the Turbines will remain at all times personal property notwithstanding that they may in any manner be affixed or attached to any other personal or real property;

11.   Forge Power was not the owner of the site and it plainly did not intend to make a gift of the Turbines to Horizon Power; and

12.   GE prescribed the mechanism for attachment and plainly did not intend the units to become the property of the owner of the land.

64   (Complaint is made by the appellants in the present proceedings that his Honour there simply adopted in substance the 12 factors that Forge Power had contended indicated that the Turbines were not fixtures and did not specifically address the competing list of factors that the appellants contended should have led to a different conclusion. I consider this complaint in due course.)

65   His Honour noted (at [135]) that one feature of the proceedings, that was brought about by the way the PPSA operates, is that GE was impelled to argue that, objectively viewed, it intended to lose its own very valuable property, stating that:

> … Somewhat ironically, because of the manner in which the PPSA operates, GE and the other defendants find themselves arguing that their property has become affixed to Horizon Power's land.

**Appeal Grounds**

66   The appellants challenge his Honour's decision on the following grounds:

1.   The trial judge erred in finding, at J[77], that where the definition of "fixtures" in s 10 of the *Personal Property Securities Act 1999* (Cth) (PPSA) refers to "affixed to land", those words embrace well known common law concepts and not a bespoke definition connoting any "non-trivial attachment" of the goods to land.

2.   The trial judge should have found that the definition of "fixtures" in s 10 of the PPSA operates according to its plain terms, requiring only an inquiry as to whether or not the goods in question are affixed to land.

3.   The trial judge should have found that:

a.   the "Turbines" (as defined at J[1]), once installed at the site identified at J[1], were "fixtures" for purposes of s 10 of the PPSA, as construed in accordance with Ground 2; and

b.   accordingly, the "Lease" (as defined in J[3]) was not a "PPS Lease" for purposes of the PPSA.

4.   Further or in the alternative to Grounds 1 through 3 above, having found that the words "affixed to land" in the definition of "fixtures" in s 10 of the PPSA properly construed embrace the common law concept of "fixtures", the trial judge erred in finding at J[134] that the Turbines were not "fixtures" for purposes of s 10 of the PPSA as so construed.

5.   The trial judge should have found that:

a.   the Turbines, once installed at the site identified at J[1], were "fixtures" for purposes of section 10 of the PPSA (as construed in accordance with Ground 4); and

b.   accordingly, the "Lease" (as defined in J[3]) was not a "PPS Lease" for purposes of the PPSA.

*Grounds 1-3 – statutory definition of fixtures*

**Appellants' submissions**

67   The appellants argue that there was neither any need nor any justification for the importation of common law concepts into the term "affixed to land", where appearing in the definition of "fixtures" in the PPSA. They contend, as they did before the primary judge, that the Act contains a bespoke definition of "fixtures", requiring only an inquiry as to whether the goods in question are physically affixed to land (in a "non-trivial" manner).

68   In this regard, the appellants point out that the PPSA introduced (as his Honour recognised at [5]) an innovative new national code for determining priorities between parties holding security interests in personal property. They refer to the statement by the Senate Standing Committee on Legal and Constitutional Affairs in relation to the 2008 Exposure Draft of the Bill to the effect that the intended purpose of the new national code was to make substantial changes to the application of, and interaction between, the Commonwealth, State and Territory legislation, common law and equitable legal principles in relation to security interests in personal property in Australia. They argue that it is the language of the statute which is determinative; not pre-existing common law concepts (referring to what was said in *Papakosmas v The Queen* (1999) 196 CLR 297; [1999] HCA 37 at [10]; *IMM v The Queen* (2016) 90 ALJR 529;

[2016] HCA 14 at [35]; *Waller v New Zealand Bloodstock* [2006] 3 NZLR 629; [2005] NZCA 254 at [18]-[19]).

69      Reliance is placed on the affirmation by the High Court in *Alphapharm Pty Ltd v H Lundbeck A/S* (2014) 254 CLR 247; [2014] HCA 42 (at [104]) that the process of construction of statutory provisions starts with the words of the statute, read in their context. The appellants point to the admonition by the High Court in *TEC Desert Pty Ltd v Commissioner of State Revenue* (2010) 241 CLR 576; [2010] HCA 49 at [14] that it is not to be assumed, when terms such as "real property", "lease" and "fixture" (that bear a technical meaning in the general law) appear in statutory regimes creating rights and imposing obligations, that those terms are there used "simply and exclusively in the sense understood by the general law". They maintain that the PPSA may be distinguished from statutes which plainly adopt and incorporate the common law conception of fixtures (such as the *Duties Act 2008* (WA), s 3 of which defines "land" as "anything that is part of land as a fixture").

70      The appellants contend that the statutory definition reflects a deliberate choice by the legislature to make affixation the only relevant criterion for the purposes of determining whether a good is a fixture for the purposes of the PPSA, arguing that Parliament should be taken to have been aware, at the time the PPSA was enacted, of the reduced emphasis then placed by the common law on the degree of annexation (when determining whether an object placed on the land is a fixture) and its focus instead on the purpose or object of annexation (referring in that regard to what was said by Sackville AJA in *Agripower Barraba* at [76]). (Pausing there, the May 2008 commentary in respect of the then draft Bill, as noted earlier, made express reference to the common law doctrine of fixtures, and to both the degree and purpose of annexation as part of the common law test for determining whether an item is a fixture but there is no reference to any reduced emphasis on the degree of annexation as opposed to purpose of annexation.)

71      The appellants point out that s 10 of the PPSA includes a definition of the "general law" and argue that, had Parliament intended "fixture" in the PPSA to mean the "general law" concept of fixture, there would have been an express

reference thereto in the definition (such as: "fixtures means goods, other than crops, that are fixtures under the general law"). Alternatively, it is submitted that had Parliament intended the common law concept of "fixture" to apply, it could simply have included no definition of that term in the PPSA at all.

72     The appellants submit that only by adopting their construction can the definition work consistently with the surrounding provisions of the PPSA: first, on the basis that if "fixtures" bears its common law meaning then the express exclusion of "fixtures" from the definition of "land" in s 10 of the PPSA has no work to do; and, second, on the basis that it avoids giving the same word ("affixed") two different meanings in the same section of the Act (s 10), there referring to the definition of "accession" in s 10 of the PPSA and noting the academic commentary to the effect that the concept of accession under the PPSA is markedly different to that at common law (see ELG Tyler, the Hon PW Young AO QC and the Hon CE Croft, *Fisher & Lightwood's Law of Mortgage* (3rd Australian ed, 2010, LexisNexis) at [5.94]).

73     The appellants further argue that Parliament, in enacting the PPSA in 2009, must be taken to have been aware of the commercial practice of persons separating interests in "land" and "fixtures", and of the litigation that has substantially expanded the definition of "fixtures" in duties legislation in the Commonwealth (referring to *Vopak Terminal Darwin Pty Ltd v Natural Fuels Darwin Pty Ltd (subject to a deed of company arrangement)* (2009) 258 ALR 89; [2009] FCA 742; *Commissioner of State Revenue v TEC Desert Pty* Ltd [2009] WASCA 128; *TEC Desert*; *Epic Energy (Pilbara Pipeline) Pty Ltd v Commissioner of State Revenue* (2011) 43 WAR 186; [2011] WASCA 228 at [52] (McLure P)).

74     It is submitted by the appellants that, in the context of an Act dealing with security interests in personal property, there is an evident policy reason for there to be a clear "bright-line" criterion by which a ready assessment could be made by any interested party (by simple observation) as to whether or not an object was a fixture under the Act (as opposed to it being necessary for there to be an inquiry into the purpose or object with which such an item was affixed). While the appellants accept (see their reply submissions at [12]) that,

on their test, whether the affixation in question is sufficient to justify a conclusion on the facts that the object had been "affixed to land" would still be a question of fact and degree in each case, they argue that this is "far more certain and coherent than the inquiry mandated by the common law doctrine of fixtures, which requires not only an inquiry into affixation, but also the purpose of those affixing the object".

75    The appellants note that in *J & D Rigging Pty Ltd v Agripower Australia Ltd* [2015] 1 Qd R 562; [2013] QCA 406, the Queensland Court of Appeal considered that the inquiry called for under the legislation there under consideration (the *Building and Construction Industry Payments Act 2004* (Qld)) as to whether a building or structure forms or is to form part of land required a practical assessment of the physical relationship between the thing and the relevant land; not an inquiry "into some stranger's intention" (see Applegarth J at [20]).

76    The appellants argue that their formulation of the substantive requirement of the definition as requiring a "non-trivial" attachment is one which is readily understandable and capable of practical application. They maintain that their construction is equally consistent with the demarcation in the Act between real and personal property.

77    As to ground 3 of the grounds of appeal, the appellants argue that if the test is (as they contend) one of physical "non-trivial" attachment, then the evidence plainly demonstrated that the Turbines are "affixed to the land". In this context, they refer to the photographic and video evidence that was before the primary judge; to Mr Burdick's evidence as to the process by which the Turbines were installed (to which I have earlier referred); and to the time and work involved in the installation process.

**Forge Power's submissions**

78    Forge Power, as it did at first instance, emphasises the distinction drawn in the PPSA between personal property and land; and argues that acceptance of the appellants' construction would introduce a new species of interest in goods, that of a "non-fixture fixture" – i.e., personal property that is affixed to land but not so as to become part of the land at common law. It argues that this would

re-introduce the uncertainty and complexity that the PPSA was enacted to overcome because such a security interest in such property would be left to be governed by the law relating to personal property outside the PPSA (as described in E Sykes and S Walker, *The Law of Securities* (5th ed, 1993, Lawbook Co) ch 17) and that there would (or would potentially) be a regulatory gap in circumstances where, after the PPSA was enacted, there was a "migration" of State based personal property registers to the Commonwealth register (see PPSA, s 306).

79    Although in its written submissions, Forge Power places reliance on the presumption of statutory interpretation (described in O Jones, *Bennion on Statutory Interpretation* (6th ed, 2013, LexisNexis) at 1047; section 366) to the effect that, where the legislature uses well known legal terms, the legislature intends that they take that legal technical meaning, in oral argument on the appeal Senior Counsel for Forge Power submitted that even without calling in aid such a presumption the same result would follow, by reference to the text, structure and objects of the PPSA (see AT 38.5).

80    In that regard, Forge Power argues that the definitional structure of the Act produces a coherent and consistent scheme: namely, that security interests in all land (including fixtures as that term is understood at common law) are to be dealt with under State law, the common law or Commonwealth statutes applicable to land; whereas security interests in personal property (other than particular types of security transactions such as pawn broking transactions) are to be dealt with by the PPSA. Forge Power notes that "land" is not defined in the legislation in a self-contained way but includes all estates and interests in land (with an exclusion for fixtures). It is submitted that "land" in the legislation must take its meaning from the general law. (Similarly, it notes that the term "goods" is not defined in a self-contained way.)

81    Forge Power points to the extrinsic material to which I have referred above (see [44]- [49] above) as confirming that legislative intention. In particular, it argues that it would only make sense to exclude fixtures (so as to prevent overlap with existing schemes of State legislation that employ the general law concept of a fixture) if the PPSA employed the same concept as that applicable

under the common law. It argues that the fundamental objective of the PPSA is, through the regime of registration of security interests, to reduce the risk to persons dealing in, and lending money on the security of, personal property and that it is inconsistent with such a legislative purpose that there be a class of personal property which is entirely outside the PPSA regime. It submits that in those circumstances third parties could not deal securely with a person who owns personal property that is, may have been or might in future be, "non-trivially" affixed to land because third parties would not be able to see from a register if any other parties have an existing security interest in the property and would not be able to register their own security interests.

82      It is further submitted by Forge Power that the same result is reached even without reference to the common law concept of fixtures, on the basis that the ordinary meaning of the verb "affix" is "to fix; fasten, join, or attach". Forge Power argues that the test of a physical connection to land in some "non-trivial" manner (as contended for by the appellants) raises questions as to what the notion of a trivial attachment entails. Forge Power argues that, having regard to the legislative context and the purpose of the exclusion, the expression "affixed to land" contemplates a connection that is so substantial and enduring as to make it fitting to take the thing outside the scope of a law concerned with personal property rather than land.

**Determination**

83      It is clear from the extrinsic materials to which I have earlier referred (and to which regard may be had in determining the legal and historical context in which words in the legislation are used – see *Bitumen and Oil Refineries (Aust) Ltd v Commissioner for Government Transport* (1955) 92 CLR 200; [1955] HCA 1, following *Assam Railways and Trading Co Ltd v Inland Revenue Commissioners* [1935] AC 445; [1934] All ER Rep 646, and more recently *Alcan (NT) Alumina Pty Ltd v Commissioner of Territory Revenue (Northern Territory)* (2009) 239 CLR 27; [2009] HCA 41 at [47]), that the "mischief" that the PPSA was intended to address was the uncertainty and complexity of the various statutory and common law regimes applicable to security interests in personal property. The legislature sought to ameliorate this by providing a new national system of registration of interests of that kind and introducing a system

of default rules to determine, among other things, priorities in respect of interests in personal property.

84    In *Alcan*, where the plurality in the High Court emphasised that the task of construction must begin with a consideration of the text itself, and that historical considerations and extrinsic materials cannot be relied on to displace the clear meaning of the text (citing *Nominal Defendant v GLG Australia Pty Ltd* (2006) 228 CLR 529; [2006] HCA 11 at [22] (Gleeson CJ, Gummow, Hayne and Heydon JJ); at [82]-[84] (Kirby J); *Combet v The Commonwealth* (2005) 224 CLR 494; [2005] HCA 61 at [135] (Gummow, Hayne, Callinan and Heydon JJ); *Northern Territory v Collins* (2008) 235 CLR 619; [2008] HCA 49 at [99] (Crennan J)), their Honours went on (at [47]) to emphasise that, while the language employed is the surest guide to legislative intention, the meaning of the text may require consideration of the context, which includes the general purpose and policy of the provision, in particular the mischief it is seeking to remedy.

85    In the present case, both parties point to awkward consequences or difficulty that may attend their opponents' preferred construction of "affixed to land" in the definition of fixtures in s 10 of the PPSA. The practical difficulty that flows from the appellants' "bespoke" definition is, as the primary judge observed (though not basing his decision on this), the difficulty in determining what is or is not a "non-trivial" attachment in any particular case. On the appellants' "bright line" test, the more trivial or superficial the form of attachment, the less certainty there might be for a third party seeking to determine whether something has or has not become a fixture. That said, the common law test of what amounts to a fixture is attended by its own difficulties (as recognised by Sackville AJA in *Agripower Barraba* at [76], his Honour there referring to the amorphous concept of the purpose or object of annexation). Where both definitions are capable of producing uncertainty in their application, little can be drawn from that in favour of one or other construction.

86    In the present case, the extrinsic materials shed light on what was meant by the legislature in using the expression "affixed to land" in s 10 of the PPSA. In

*CIC Insurance Ltd v Bankstown Football Club Ltd* (1997) 187 CLR 384; [1997] HCA 2, Brennan CJ, Dawson, Toohey and Gummow JJ said (at 408):

> It is well settled that at common law, apart from any reliance upon s 15AB of the *Acts Interpretation Act 1901* (Cth), the court may have regard to reports of law reform bodies to ascertain the mischief which a statute is intended to cure. Moreover, the modern approach to statutory interpretation (a) insists that the context be considered in the first instance, not merely at some later stage when ambiguity might be thought to arise, and (b) uses 'context' in its widest sense to include such things as the existing state of the law and the mischief which, by legitimate means such as those just mentioned, one may discern the statute was intended to remedy. Instances of general words in a statute being so constrained by their context are numerous. *In particular*, as McHugh JA pointed out in Isherwood v Butler Pollnow Pty Ltd (1986) 6 NSWLR 363 at 388, *if the apparently plain words of a provision are read in the light of the mischief which the statute was designed to overcome and of the objects of the legislation, they may wear a very different appearance.* Further, inconvenience or improbability of result may assist the court in preferring to the literal meaning an alternative construction which, by the steps identified above, is reasonably open and more closely conforms to the legislative intent. [my emphasis] [footnotes omitted]

87    The distinction between legislative purpose and linguistic meaning as the determinative factor of whether regard may be had to extrinsic materials has been doubted (see *James Hardie & Co Pty Ltd v Seltsam Pty Ltd* (1998) 196 CLR 53; [1998] HCA 78 at 76-7 (Kirby J in dissent, with whose judgment McHugh J agreed)). Basten JA in *Shorten v David Hurst Constructions Pty Ltd* (2008) 72 NSWLR 211; [2008] NSWCA 134 in *obiter*, referring to the statement of principle by Mason P in *Harrison v Melhem* (2008) 72 NSWLR 380; [2008] NSWCA 67 to the effect that resort to a Minister's speech to guide the meaning of legislation beyond identifying its purpose was not permissible, said (at [27]):

> The statement of principle set out by Mason P in *Harrison* … appears to accept that access may be had to extrinsic material to determine legislative purpose, but not if it directly addresses linguistic meaning. Thus, in the present case, reference might be had to the minister's statement in order to determine the purpose which lay behind the introduction of the additional words, but might be inadmissible as an aid to understanding the meaning of the words. In *Marshall v Director-General, Department of Transport* [2001] HCA 37; 205 CLR 603 at [62], in a passage quoted with approval by the Court in *Walker Corporation Pty Ltd v Sydney Harbour Foreshore Authority* [2008] HCA 5; 82 ALJR 489 at [31], McHugh J stated that the duty of courts "when construing legislation is to give effect to the purpose of the legislation", identifying "[t]he primary guide to understanding that purpose" as "the natural and ordinary meaning" of the statutory language. *It would seem that linguistic meaning and purpose are inextricably interwoven: accordingly a distinction of the kind identified in Harrison, if intended, is unattractive. It finds no basis in the statutory language of the Interpretation Act, nor, in my view, in High Court authority.* However, in the present case, it is sufficient to say that the extrinsic

material may be of assistance in understanding the purpose of the provision. [my emphasis]

88      Earlier, the High Court in *Re Australian Federation of Construction Contractors; Ex parte Billing* (1987) 61 ALJR 39 at 39; [1986] HCA 74 at [4], in a joint judgment, said:

> Reliance is also placed on a sentence in the second-reading speech of the Minister when introducing the *Consequential Provisions Act*, but that reliance is misplaced. Section 15AB of the *Acts Interpretation Act 1901* (Cth), as amended, does not permit recourse to that speech for the purpose of departing from the ordinary meaning of the text unless either the meaning of the provision to be construed is ambiguous or obscure or in its ordinary meaning leads to a result that is manifestly absurd or is unreasonable. In our view neither of those conditions is satisfied in the present case.

89      In *Wilson v State Rail Authority of New South Wales* (2010) 78 NSWLR 704; [2010] NSWCA 198 at [12], Allsop P (as his Honour then was) said of the use of extrinsic materials in the interpretive process (Giles, Hodgson, Tobias and Macfarlan JJA agreeing):

> … as is now beyond dispute, in construing an Act, a court is permitted to have regard to the words used by Parliament in their legal and historical context. Context is to be considered in the first instance, not merely when some ambiguity is discerned. Context is to be understood in its widest sense to include such things as the existing state of the law and the mischief or object to which the statute was directed. These are legitimate means of understanding the purpose of the Act and of the relevant provisions, against which the terms and structure of the provisions of the Act, as a whole, are to be understood.

90      There are of course limitations on the permissible use of extrinsic materials. See *Re Bolton; Ex parte Beane* (1987) 162 CLR 514; [1987] HCA 12, where Mason CJ, Wilson and Dawson JJ cautioned at 518 as follows:

> The words of a Minister must not be substituted for the text of the law. Particularly is this so when the intention stated by the Minister but unexpressed in the law is restrictive of the liberty of the individual. It is always possible that through oversight or inadvertence the clear intention of the Parliament fails to be translated into the text of the law. However unfortunate it may be when that happens, the task of the court remains clear. The function of the court is to give effect to the will of Parliament as expressed in the law.

91      In *Saeed v Minister of Immigration and Citizenship* (2010) 241 CLR 252; [2010] HCA 23 French CJ, Gummow, Hayne, Crennan and Kiefel JJ said (at [31]) that, however clear or emphatic, statements as to legislative intention made in explanatory memoranda or by Ministers cannot overcome the need carefully to consider the words of the statute to ascertain its meaning. More recently, in

*Certain Lloyd's Underwriters v Cross* (2012) 248 CLR 378; [2012] HCA 56
French CJ and Hayne J acknowledged (at [25]) that appropriate use may be
made of extrinsic materials but emphasised (at [26]) that the task of
construction begins with the terms of the legislation and not from some *a priori*
assumption about its purpose. A similar warning was sounded by Kiefel J (as
her Honour then was) at [89]:

> It is legitimate to resort to materials outside the statute, but it is necessary to
> bear in mind the purpose of doing so and the process of construction to which
> it is directed. That purpose is, generally speaking, to identify the policy of the
> statute in order to better understand the language and intended operation of
> the statute. An understanding of legislative policy by these means does not
> provide a warrant for departing from the process of statutory construction and
> attributing a wider operation to a statute than its language and evident
> operation permit.

92    It is not permissible for a court, by a process of statutory interpretation, in effect
to substitute its own view of what should be the preferable ambit of legislation
or to take it upon itself to re-write legislation in a way that corrects what is
thought to be an inadvertent consequence of infelicitous language in a statute.
However, in the present case, while the ordinary meaning of the word "affixed"
is not unclear (in the sense that it points to a form of attachment), what is
uncertain is the nature and degree of attachment that will be sufficient for the
purposes of the definition. The appellants do not suggest that a trivial or
superficial attachment (say, for example, a helium balloon attached by string to
the land) would be sufficient but nor do they accept the suggestion that what is
required is a "substantial and enduring" kind of attachment -indeed they
maintained that the "temporariness" or otherwise of the attachment is an
irrelevant factor to take into consideration.

93    In oral argument, Senior Counsel for the appellants accepted that in
determining whether the Turbines were affixed to the land (for the purposes of
the bespoke definition for which they contend), the only factors out of the list of
factors identified by Conti J in *Blacker* (at [13]-[14]; see [62] above) that would
not be relevant would be, first, whether the attachment was for the better
enjoyment of the property generally or was for the better enjoyment of the land
and/or buildings to which the item was attached; second, whether the item was
to be in position permanently or temporarily; and, third, other than to the extent
to which it informs the physical connection, the nature of the property the

subject of affixation (i.e., the first and third bullet points at [13] as well as, to a limited extent, the second) (see AT 13).

94      The genesis of the exclusion of "fixtures" from the PPSA, as made clear in the 2009 commentary to the revised bill, was the request made from the States that "fixtures" be excluded. In the context of the description of "fixtures" in the commentary to the initial draft, and the reference in 2009 to existing schemes dealing with fixtures, it is clear that what the legislature had in mind (in excluding in s 8(1)(j) interests in fixtures from the PPS regime) was the concept of fixtures as understood in, or consistent with, the common law doctrine of fixtures. The commentary in relation to the revised draft bill (when s 8(i)(j) was inserted) makes that clear – the reference there to "fixtures" must be understood as meaning fixtures according to common law concepts, since there is no other meaning readily attributable to "fixture" to which that reference could relate.

95      The appellants' response to the reliance placed by Forge Power on the extrinsic materials in this regard is that this goes only to the question whether fixtures were to be included or excluded from the PPSA and does not fix the metes or bounds of what would or would not be considered a fixture for the purposes of the PPSA. However, read as a whole it is apparent that when the proposed bill was initially to include "fixtures" in the PPS regime it was the common law concept of fixtures that was in contemplation and that what the revised bill was intended to do was to remove "fixtures" in that sense from the regime. That provides strong support for the construction adopted by the primary judge.

96      The primary judge was in my respectful opinion correct when he considered that the clear demarcation in the PPSA between real property and personal property supports such a conclusion. There is nothing in the PPSA to support the suggestion that Parliament intended personal property that is affixed to land, but not in such a way as not to become part of the land at common law, to be a species of property not governed by the PPSA.

97      The presumption that Parliament intended, by the use of the term "fixtures", to import the common law notion of affixation is consistent with such a conclusion.

In that regard, I note that *TEC Desert* did not suggest that Parliament might not in a particular case be taken to have intended by the use of a particular term to import the established legal meaning of that term, simply that it could not necessarily be assumed that this be the case. Nor do I accept that *J & D Rigging* provides much assistance to the appellants insofar as there the Court was dealing with the test for determining what formed part of the land for the purpose of legislation governing payment of moneys in the building construction industry. Here, the words "affixed to land", in the context of a definition of "fixtures" in legislation which draws a distinction between real and personal property, may more readily be seen as falling within the first of the situations to which Applegarth J had regard (namely, where the importation of rules about fixtures in the law of real property may be justified in the context of a statute concerned with property and its ownership or statutes which impose obligations based on ownership – see *J & D Rigging* at [19]).

98    However, as Forge Power submits, it is not necessary to resort to such a presumption in the present case. The extrinsic materials make clear that the common law meaning of the term "fixtures" was what was initially proposed to be included in and then removed from the PPS regime.

99    Little assistance is gained from the innovative nature of the PPSA. The desire to establish a new national regime to deal with security interests in personal property does not of itself make it more or less likely that the definition of "fixtures" was intended to be a bespoke definition.

100   As to the contrary indications sought to be drawn by the appellants from the text of the legislation, the presence of a definition of "general law" does not advance matters. True it is that the legislature could have defined "fixtures" in a way that would have made explicit the nature and degree of affixation required for goods to become fixtures; or could simply have left the term undefined (on the assumption that the well-settled meaning of the term at common law would then be applied). However, the fact that Parliament chose neither of those alternatives does not mean that the construction for which the appellants contend was what was intended.

101   Nor does the use of the word "affixed" in the PPSA provision dealing with accession of goods provide any real assistance to the appellants. Forge Power argues that this is so for three reasons. First, the expression "accession" is used in the PPSA in a different sense from the way in which the expression is used in the general law (the latter identifying a proprietary consequence for a certain type of attachment of one chattel to the other; the former identifying particular goods). Second, in contrast to the common law doctrine of accession where detachment is not practicable, it says that "accession" is used in the PPSA in the sense of co-mingling (referring to the discussion of this in *Fisher & Lightwood* at [5.94]). Third, it argues that there is no inconsistency in the word "affixed" being used with different senses in different contexts in the Act. Forge Power argues that the concept of accession in the context of goods attached to other goods, unlike the concept of fixtures, does not have a technical meaning in the law of property. In my opinion, the fact that goods will not amount to an accession for the purposes of the PPSA if they, and the goods to which they affixed, are both required or permitted to be described by serial number under the regulations (which is the effect of the PPSA provision) illustrates that the concept of affixation in the definition of "accession" cannot be assumed to be the same as that when used in the definition of fixtures.

102   Resort to the analogy of tenant's fixtures also does not assist the appellants. The fact that, at common law, a tenant may at the end of the lease term remove fixtures that would otherwise have formed part of the land by reason of their affixation (and that such fixtures will be part of the land until severed in accordance with the doctrine) says nothing about the meaning of "affixed to land" in the statutory definition of fixtures for the purposes of the PPSA.

103   Textually and contextually, there are a number of indications that support the conclusion that the definition was intended to import common law notions of affixation. First, though I do not place any weight on this, it might well be thought that use of the verb "affix" is intended to have a more technical meaning than that which would be conveyed by the more everyday language of "attach" or "install". Second, there is the demarcation in the PPSA between land and personal property, which the primary judge considered to be a critical pointer towards the construction he adopted. Third is the exclusion of "fixtures"

from the definition of land. This makes sense only if it is contemplated that what is expressly excluded from the definition of land (i.e., fixtures) would or might otherwise fall within the definition. Chattels that are affixed to the land but not so as to form part of the land at common law (i.e., that would fall within the appellants' bespoke definition) would not need to be excluded from the definition of land. This is a strong textual indication to support the construction for which Forge Power contends and which his Honour found.

104   The irony of the stance adopted by the appellants is that, if applied to its logical extent, arguably this would not bring the Turbines within the definition of a "fixture" for the purposes of the Act because both forms of attachment (via the Seismic & Wind Kits and via the pipelines/conductors) would be attachments to "fixtures" not to "land" (the Seismic & Wind Kits and pipelines or conductors themselves being items "non-trivially attached" to the land). When this was raised in the course of argument, the appellants suggested that the answer to this may be that the accession provisions of the PPSA make the accretions to the Turbines part of the Turbines themselves; whereas for Forge Power it was submitted that the natural resistance to the syllogism encompassed in the proposition that goods affixed to a fixture are not fixtures for the purposes of the Act illustrates that the appellants' construction is not a workable construction (see AT 25.31-26.19; cf AT 43.30-45).

105   Based on the second and third of the textual/contextual indicators referred to above, and the clear legislative intent discernible from the extrinsic materials, grounds 1 to 2 of the grounds of appeal are not made good and ground 3 therefore does not arise. Had it arisen, i.e., had the correct test been one of physical affixation to land alone (albeit of a non-trivial nature), and assuming that the appellants could overcome the problem that on that definition the Turbines would not be a fixture because they would be affixed to another fixture, one would be driven (as the appellants appeared to accept) to the common law test for a fixture at least insofar as that relates to the nature and degree of annexation of the goods to the land. I consider the application of the common law test in relation to grounds 4-5 below.

106   For the purposes of ground 3, suffice it to say that if the test of affixation is one
that looks to the substance, or enduring nature, of the affixation (which seems
in practical terms to be what is encompassed by the reference to a "non-trivial"
attachment), i.e., to some form of attachment that warrants a conclusion that
the item should be treated in the same way as land, then even on that
definition I am not persuaded that his Honour erred in holding that the Turbines
did not become fixtures for the purposes of the Act. That is because, even if
one could have regard only to the factors considered by Conti J in *Blacker* (at
[14]) as to the degree of annexation, in the present case: the mode of
attachment was one which was intended to be reversible (via the
demobilisation process), even though that process might be a "tricky" one; both
the Turbines and the Seismic & Wind Kits themselves were intended to be re-
usable once disconnected from the power station; and the damage envisaged
to be caused by removal of the Turbines seems to have been limited to the
need to cut through the bolts by which the Seismic & Wind Kits were attached
to the pedestals or concrete foundation (which damage would hardly be
comparable to the value of the Turbines themselves). The need (if in fact there
be any need) to remove the concrete slabs in order to restore the ground to its
pre-existing condition does not necessarily mean that the land underneath the
concrete foundations, once they have been removed, would be damaged in
any relevant sense.

107   Accordingly, grounds 1-3 are not made good.

*Grounds 4-5 – Did the Turbines become fixtures under the common law test*

108   The remaining grounds of appeal proceed on the basis that his Honour
correctly held that the definition of "fixtures" in s 10 imports the common law
notion of fixtures. In that event, the appellants challenge his Honour's
conclusion that the Turbines did not become fixtures in accordance with
common law concepts. The appellants do not cavil with his Honour's summary
of the applicable principles in this regard; rather, they complain as to the
application of those principles.

109   As to the list of 12 factors identified by his Honour (at [134]) as leading to the
conclusion that the Turbines did not become fixtures applying the common law

test, the appellants point out (as I have noted earlier) that in substance those were the factors that Forge Power had listed in a document handed up to the primary judge at the hearing at first instance. They complain that there was no analysis in his Honour's reasons of the competing considerations raised by the list of 11 matters that they had identified in a competing document handed up to the primary judge as justifying the conclusion that the Turbines were fixtures at common law. Copies of both documents were handed up to this Court on the appeal.

110    The 11 matters on which the appellants had relied for the contrary conclusion were grouped under the following four headings: "affixed for better enjoyment of land as part of an integrated power station operated on the land"; "so-called "temporary" nature of the affixation of the generators to the power station"; "physical characteristics of the generators and their affixation"; and "contractual provisions [that] support the fixture argument". The appellants complain that of those matters, the primary judge failed (or failed sufficiently) to take into account those under the first three headings: namely, the purpose of affixation; the so-called temporary nature of the affixation; and the physical characteristics of the Turbines.

111    First, as to the purpose of affixation, the appellants argue that the fact that the Turbines were an integral and essential part of a large working electric power station points to them being fixtures because they were annexed to the land for the better enjoyment of the land for use as a power station (referring to *Commissioner of State Revenue (Vic) v Snowy Hydro Ltd* (2012) 43 VR 109; [2012] VSCA 145 at [26]-[29]; *Re Origin Energy Power Ltd v Commissioner of State Revenue* (2007) 70 ATR 64; [2007] WASAT 302 at [115]-[131]; *Vopak* at [63] and [68]; *Agripower Barraba* [91]-[92]; *Consolidated Edison Company of New York Inc v City of New York* (1978) 44 N.Y.2d 536; and *Commissioner of Stamps (WA) v L Whiteman Ltd* (1940) 64 CLR 407; [1940] HCA 30).

112    They emphasise in this regard: the scale and permanence of the power station as shown in the Scope of Work issued by Horizon Power; that the power station was to be constructed on Crown land (and that Horizon Power was entering into the Lease as a statutory corporation under the *Electricity*

*Corporations Act 2005* (WA)); that the nature and purpose of the power station was to "meet the growing demands of the [Port Hedland] region", and that the Plant was to consist of dual fuel open gas turbines, associated BOP and a switchyard (the turbines using natural gas as a primary fuel and diesel as emergency backup fuel).

113    The appellants submit that removal of the Turbines would mean that the whole power station would be rendered inoperable; and say that, equally, the Turbines are inoperable on their own; i.e., without the balance of the power station the Turbines are unable to generate electricity in any useable way.

114    Second, as to the so-called "temporary" nature of the affixation of the Turbines to the power station, the appellants refer to the evidence given by Mr Jeremy Paul, an engineer and project manager who was seconded to the Forge group of companies from about 10 June 2013 to about 14 February 2014 to work on the construction, operation and maintenance project known as the South Hedland Temporary Power Station Project. In his affidavit affirmed 27 November 2014 (at [8]) Mr Paul deposed to the effect that the power station was referred to as "temporary" because it was expected that the power generation equipment to be used in the project would be superseded within a few years by a longer term and larger power station at South Hedland, to be constructed by a future successful contracting entity. (Pausing there, it is by no means clear, from his affidavit, the basis on which Mr Paul formed the understanding expressed at [8] as to the use of the term "temporary" in connection with the power station project but in any event it does not gainsay that the power station, and hence the affixation of the Turbines for the purposes prescribed by the Lease, was anticipated to be of temporary duration.)

115    The appellants note that the Scope of Work in Schedule 3 to the BDOM, included reference to future works at the site, insofar as it referred to "design, supply, installation and commission of the earthing system and lightning protection, and the provision of extension of earth grid to future generators and associated equipment". They also point to the provisions of the Lease providing for the extension of the End Date beyond the initial two year term (Arts 9 and

10.1) and to the potential for this to be an open-ended arrangement, with the agreement contemplating that Forge Power could request a further extension of the term for any period (Art 10.2). They note that the Lease contained a monthly price for an extended term.

116     Further, the appellants argue that the existence of a finite term of lease is not determinative (since this exists in all tenants' fixtures cases), pointing to the reference by Sackville AJA in *Agripower Barraba* (at [81]) to the difficulty expressed by Mahoney JA in *N H Dunn Pty Ltd v L M Ericsson Pty Ltd* (1979) 2 BPR 9241 (at 9243-4) in accepting that the question whether an object had become a fixture could be tested simply by reference to whether the annexation to the realty is intended to be temporary or permanent.

117     As to the third heading in their list of factors which the appellants argue the primary judge failed (or failed sufficiently) to take into account (namely, the physical characteristics of the Turbines and their affixation), the appellants note the weight and size of the Turbines; that they must be installed on a level foundation; that in this case they were installed on a concrete foundation; the time taken by the installation and commissioning/decommissioning processes respectively; and that the commissioning phase involves the connection of the turbines to external fuel sources, plumbing and the customer's site generally (as earlier described – see [32] above). The appellants argue that, for practical purposes, the Turbines, though mobile, could not be moved from month to month.

118     The appellants also take issue with the acceptance by the primary judge (at [134(6)]) that the Turbines can be removed without damage to the land. They point to Forge Power's concession that "the bolts connecting it to the concrete have to be removed" (T 14.42) which was conceded to be the "tricky bit" as those bolts "have been epoxied into the concrete in the anchors" (T 17.21-17.23). The appellants note that the various fuel, water and electrical plumbing would have to be dismantled and disconnected; and that the concrete slab and the foundations left on site would need to be destroyed if the land were to be returned to its original state. The appellants argue that decommissioning and remediation would "self-evidently be likely to be an expensive process".

119   The appellants contend that, in substance, his Honour's conclusion was driven
      by his perception as to the temporary nature of the affixation and the fact that
      Forge Power did not intend to make a gift of the Turbines to Horizon Power.
      The appellants argue that his Honour paid no, or insufficient, regard to what
      they submit is the strong analogy in the present case with "tenant's fixtures".
      They argue that, as with tenant's fixtures, the mere fact that objects are affixed
      for a finite period and there may be an intention to remove the objects at the
      end of a lease term does not prevent them from becoming fixtures for so long
      as they are affixed. In that context they point to the fact that (as they say is
      commonly in the case of tenant's fixtures) there were contractual rights of
      severance between Horizon Power, Forge Power and GE.

120   The appellants argue that the fact that, under cl 10.2 of the DBOM, title to the
      Turbines did not contractually pass to Horizon Power is not inconsistent with
      them being fixtures; nor is the fact that under cl 14 of the Lease title did not
      pass from the lessor to Forge Power. The appellants argue that the fact that in
      this case the severance provisions were included in the Lease is capable of
      indicating that the parties contemplated that the Turbines would become
      fixtures, and therefore there needed to be a contractual right of severance.

      **Forge Power's submissions**

121   Forge Power refers to *TEC Desert* (at [24]) and *Agripower Barraba* (at [74]-
      [81]) as authority for the proposition that the ultimate question, when
      determining whether on common law principles goods brought onto the land
      have become a fixture and thus part of the land are settled, remains one of the
      objective intention with which the item was put in place, having regard to the
      degree and object of annexation of the item.

122   It submits that statements made by the owner of the chattel or of the realty as
      to the intention that the chattel shall or shall not be part of the realty may, if
      appropriately proved and evidenced, be relevant in the determination of the
      ultimate fact to be proved (referring to *N H Dunn* at 9244 (Mahoney JA);
      *Permanent Trustee Australia Ltd v Esanda Corp Ltd* (1991) 6 BPR 13,420 at
      13,423 (Rolfe J); and *PwC Legal v Perpetual; Trustees Victoria Ltd* (2007) 14
      BPR 26,835; [2007] NSWCA 271 at [57]-[60]; [76]; [83]-[90]). It says that

where, as here, the intention of the parties who brought or consented to the bringing of the chattel onto the land is reflected in an agreement governing their rights and obligation to deal with the chattel, that statement of intention may be of significant weight; referring to *Commissioner of State Revenue v Uniqema Pty Ltd* (2004) 9 VR 523; [2004] VSCA 82 where the Court said (at [48]):

> ... Secondly, the terms of the lease... were such as to make it abundantly clear that not only did the tenant have the right to remove the plant and equipment at the end of their commercial arrangement, but that it was under an obligation to do so. *In terms of intended permanence, or the contrary, there could be no more emphatic statement of the parties' objects in allowing the plant and equipment to be brought onto the land than their mutual desire to see it removed at the end of the relationship*... [my emphasis]

123   Forge Power points to Arts 13 and 14 of the Lease in this regard, emphasising that the Port Hedland power station was a temporary power generation facility. It notes that, consistently with all parties' intention that property in the Turbines would not pass to Horizon Power upon their installation on the Port Hedland site, GE assigned its "title" to the Turbines to AssetCo in October 2013. It also points to the warranty given by GE to APR (in the context of the transfer of the shares in AssetCo to a subsidiary of APR), that GE had title to the Turbines (cl 3.08 of the Business Transfer Agreement).

124   As to the three matters on which the appellants place emphasis, Forge Power submits as follows.

125   First, as to the purpose of affixation, it submits that the appellants have conflated two distinct purposes (the purpose for which an item is brought onto land and the purpose for which an item is affixed to land) arguing that it is only the latter which is potentially relevant to the question whether the item has become a fixture. It relies on the proposition that if a chattel is fixed to the land or building for more convenient use as a chattel (as it says is the case here), it is not a fixture; whereas if it is fixed to the land or building for the more convenient use of the land or building, it may be a fixture (there referring to *Reid v Smith* (1906) 3 CLR 656 at 680; [1905] HCA 54).

126   Forge Power submits that this distinction is illustrated by *Attorney-General v RT Co Pty Ltd* (1957) 97 CLR 147; [1957] HCA 29 in which Fullagar J

concluded (albeit in *obiter dicta*) that two rotary printing machines (which weighed about 45 tons, required dismantling to be removed, and which were attached by nuts and bolts to a concrete foundation) were not fixtures. Reference is made in particular to his Honour's statement (at [38]) that:

> … the only proper inference is that affixing the presses by nuts and bolts was effected for the purpose of holding them steady when in operation and for the more efficient use of them.

127     In the present case, Forge Power submits that the means of affixation of the Turbines to the land (by way of the Seismic & Wind Kit) was plainly for the more efficient use of the Turbines as chattels, in order to prevent damage to them from the cyclonic conditions to which the site was exposed (not for the better use of the land) and that by analogy with the printing press case, this is a factor pointing to the Turbines not becoming fixtures.

128     Forge Power argues that the authorities on which the appellants rely (at [39] of the appellants' submissions; see [111] above) for the proposition that the purpose of affixation are distinguishable on their facts, none involving a plant consisting of a mobile generator unit on a short term lease with an obligation to return the unit at the end of the term.

129     Second, as to the "temporary" nature of the affixation, Forge Power again emphasises that the site was a temporary power station and notes that the DBOM "Scope of Work" made clear that the generators contemplated were mobile units to be leased for a fixed term. It contends that removal of the Turbines from the site would not mean that the power station would be rendered inoperable; pointing out that the removal of the Turbines was intended to coincide with the cessation of the use of the land as a temporary power station. It submits that even if the Turbines were removed while the temporary power station remained operative Horizon Power could readily lease or procure replacement mobile turbines to perform the same function, whether from GE or a third party.

130     Further it contends that it is incorrect to assert that the Turbines were inoperable on their own without the balance of the power station. Forge Power notes that the Turbines produced electricity which could be channelled into any electricity distribution network to which they were connected, referring to the

description of the Turbines on GE's website as a "complete turnkey energy solution that can provide power whenever and wherever it's needed" which could be installed and commissioned "in as a few as eleven days", could be mounted on a mobile two-trailer assembly and transported via land, sea and air "whenever and wherever it's needed", and that its "[c]ompact footprint allows for higher power density, and its lighter weight allows for enhanced mobility, include the ability to relocate units as necessary".

131   Forge Power also points to GE's current brochure for the Turbine which describes the mobility of the unit as follows:

> Mounted on a mobile, two-trailer assembly, TM2500+ generator sets can be transported via land, sea and air to some of the most remote places in the world. Their mobile nature means that they can be swiftly deployed to other sites within days when they are no longer required at the original site.

132   As to the appellants' submission that his Honour erred in placing too much weight on the temporary nature of the affixation of the Turbines, Forge Power points out that the primary judge did not hold that the question whether an object has become a fixture could be tested simply or solely by reference to whether the annexation to the realty was intended to be temporary or permanent; rather, his Honour considered it as part of his consideration of all of the factors referred to by Conti J in *Blacker*.

133   That said, Forge Power submits that an intention that the chattel remain on the land only temporarily is *prima facie* indicative of an intention that it remain a chattel; and that the shorter the intended period of affixation the stronger the inference.

134   Forge Power maintains that the appellants' reliance on the analogy of tenant's fixtures is of no assistance in circumstances where Forge Power was not Horizon Power's tenant. It argues that the doctrine of tenant's fixtures is a general law rule, independent of contract, permitting a tenant within a certain period of termination of the lease to remove fixtures if they fall within certain categories; and that it applies to items that are otherwise fixtures determined in accordance with the general law principles.

135   Forge Power accepts that its contractual right to remove the Turbines at the end of the O&M phase of the DBOM does not compel the conclusion that they

were not fixtures, since a right of removal is also present in respect of tenant's fixtures. However, it maintains that its contractual right to remove them (and its obligation under the Lease to return them at the conclusion of a relatively short period of time – the potential term with all extensions being 4 years) are material considerations when determining whether they were fixtures at common law.

136   Finally, as to the contention by the appellants that the degree of affixation supports the conclusion that the Turbines were fixtures, Forge Power emphasises that the Turbines were mobile turbines, each sitting on a trailer with wheels and designed to be moved from place to place. It points to the matters noted by the primary judge as to the installation and commissioning process at [115]; [116]); [121]; [122]; [126]; [128]-[129] and [132]; and to the description of the process of installation contained in the GE Installation and Commissioning Manual.

137   Forge Power notes that, apart from the Seismic & Wind Kit, the Turbines were not anchored to the land; they rested by their own weight on the wheels of the trailers and by landing gear resting on support blocks; that the outriggers, support pedestals and guy wires of the Seismic & Wind Kits were intended to be removed with relative ease so as to enable removal of the mobile trailers and that the kits themselves were intended to be re-used at a new site.

138   Forge Power submits that the reason for installation of the optional Seismic & Wind Kits was to keep the trailers upright and undamaged in the event of a cyclone (referring to Mr Paul's 27 November 2014 affidavit at [47]), Port Hedland being in cyclone territory (as explained by Mr Burdick in his 6 March 2015 affidavit at [44]); and therefore maintains that affixation of the Turbines to the land by means of those kits was for the more convenient use of the Turbines as chattels and not for the more convenient use of the land.

139   As to the question of removal from the site, Forge Power maintains that the Turbines were designed to be removed without damage to the land. It accepts that cutting the epoxied anchor bolts securing the Seismic Kit's outrigger feet and pedestals will destroy the bolts but maintains that it will have no impact on

the land; nor will it damage the Seismic Kit which can be installed at a new site with new bolts.

**Determination**

140   There is no dispute between the parties as to the applicable common law principles relating to the determination of when an item placed on land becomes a fixture. His Honour clearly had in mind those principles and that it was necessary to take into account all the circumstances of the case.

141   His Honour described in some detail the Turbines and the processes of installation and commissioning that occurred. Thus the suggestion that his Honour failed to take into account, or failed sufficiently to take into account, the physical characteristics of the Turbines is not a fair or sustainable criticism of his Honour's reasoning process. Nor can it fairly be said that his Honour failed (or failed sufficiently) to take into account the purpose of affixation or the "temporary" nature of the affixation. Rather, his Honour's review of the contractual provisions addressed the circumstances in which the Turbines came to be installed at the site, their function and the parties' objectively ascertainable intentions as to the temporary nature of the affixation.

142   True it is that his Honour expressed succinctly the 12 factors which had led to his conclusion, those factors drawing heavily on the matters to which Forge Power had pointed, and did not similarly itemise the list of factors put forward by the appellants. To the extent that the latter were the converse of that which had been put by Forge Power, and accepted by his Honour, it was not necessary to list those factors that did not lead his Honour to reach the conclusion contended for by the appellants. Subject to one qualification, to which I refer below, I do not accept that his Honour did not have regard to the various matters on which the appellants relied, in the course of explaining the conclusion reached as to the various factors identified by Conti J in *Blacker*. In so doing, it is not correct in my opinion to suggest that his Honour placed undue precedence on the temporary nature of the affixation and the expressed contractual intention that there not be a gift of the Turbines. Those were matters that it was open to his Honour to take into account and, in the present case, those were matters that pointed strongly to the Turbines not being

fixtures at common law, particularly when at least one of the modes of affixation (the Seismic & Wind Kits) was clearly for the better use of the Turbines and not for the better enjoyment of the land.

143   Turning to the three particular areas in which complaint of his Honour's reasoning process is made, the first is as to the purpose of affixation.

144   I accept, and this is the qualification to which I referred above, that the primary judge did not expressly address the significance of the pipeline connections when concluding that the Turbines were installed on the land for the better enjoyment of the Turbines themselves and not for the better enjoyment of the land. As earlier noted, there were two aspects of physical affixation relied upon by the appellants: the electrical/fuel connections and the connection by means of the Seismic & Wind Kits. The latter kind of connection is in my opinion clearly one that is for the better enjoyment or use of the Turbines themselves (i.e., to stabilise them in the event of a cyclone). That kind of connection does not (as made clear in the printing press case) indicate that the item has become a fixture.

145   More problematic is the former kind of connection. Some of the pipeline/fuel connections were clearly for the better use or enjoyment of the Turbines (such as the connection through which electricity was delivered in order for the Turbines to be able to operate). However, some (such as those through which electricity generated by the Turbines was to be delivered to the power station grid) can only be seen as being for the purpose of the use of the land as a power station. There is, therefore, substance to the complaint by the appellants that the primary judge did not expressly take that aspect of the connection to the land into account. However, the nature and degree of that kind of affixation is not in my opinion so substantial or enduring as to warrant a finding (when weighed with the other relevant factors) that the Turbines thereby became fixtures. The connection was one effected through an attachment to pipelines/conductors, which connection was designed to be reversible or detachable (much as a plug in an electric socket would be) and not of a permanent nature.

146   As to the "temporary" nature of the power station, from an objective point of view this can readily be gleaned from the finite terms provided for under the DBOM and Lease. The fact that the parties might have chosen to renew their arrangement beyond the option terms specified or indefinitely (i.e., to do so outside the terms of the relevant agreements) does not gainsay that, on the documentation, the Lease was intended to be operative for a relatively short finite period.

147   While the temporary nature of the affixation is not a determinative factor, it is not, as the appellants contended, an irrelevant consideration. Nothing in *N H Dunn* or *Agripower Barraba* suggests otherwise. In *N H Dunn*, what his Honour said in this regard (at 9243-4) was as follows:

> However, the maxim has not been applied rigidly in this way: In *re de Falbe; Ward v Table* [1901] 1 Ch 523 at 530; *Reid v Smith* (1905-6) 3 CLR 656 at 670. It is, in my opinion, now accepted that a chattel may become part of realty notwithstanding that it is not, in any formal sense, annexed to it but rests on it merely by its own weight: *Reid v Smith*, supra, at 668, 669, 679. Even if a chattel is physically annexed to the realty, it may yet remain, at all times, personally: *Attorney-General of the Commonwealth v R T Co Pty Ltd* (1957) 97 CLR 146 at 156-7: *Anthony v Commonwealth* (1973) 47 ALJR 83 at 89E: *Australian Provincial Assurance Co Ltd v Coroneo* (1938) 38 SR (NSW) 700 at 712. But, if whether a chattel has become part of the realty is not to be determined by the simple test of annexation, no other simple test has, in my opinion, been generally accepted. It has been said that whether a chattel has become part of the realty depends upon the object and purpose of its annexation or juxtaposition to it: see *Halsbury's Laws of England* 3rd ed, vol 23, p 490(b) and the cases there referred to; see also *Commissioner of Stamps (Western Australia) v L Whiteman Ltd* (1940-41) 64 CLR 407 at 411. But that leaves to be determined the question: with what object or purpose must the chattel be there in order that it be held part of the realty? In the *Coroneo* case, *supra*, at 712, Jordan CJ said:
>
>> "The test of whether a chattel which has been to some extent fixed to and is a fixture is whether it has been fixed with the intention that it shall remain in position permanently or for an indefinite or substantial period: *Holland v Hodgson* (1872) LR 7 CP 328 at 336; or whether it has been fixed with the intent that it shall remain in position only for some temporary purpose: *Vaudeville Electric Cinema Ltd v Muriset* [1923] 2 Ch 74 at 87."
>
> I would, with respect, find difficulty in accepting that the matter can be tested *simply by reference* to whether the annexation to the realty is intended to be temporary or otherwise, particularly if the words "temporary purpose" are to mean what, in *Holland v Hodgson*: see at 337, Blackburn J took them to mean. I doubt that such a view is consistent with, eg, *Attorney-General of the Commonwealth v R T Co Pty Ltd (No 2)* (1956-57) 97 CLR at 156-7; cf *Kay's Leasing Corporation Pty Ltd v CSR Provident Fund Nominees Pty Ltd* [1962] VR 429 at 433-4; or *Anthony v The Commonwealth* (1973) 47 ALJR at 89.

> Both Fullagar J and Walsh J held that the items there in question were not part of the realty, notwithstanding that they had obviously been annexed for a purpose which, at least within the meaning of the term in *Holland v Hodgson*, was not a temporary purpose. [my emphasis]

148   The words "simply by reference" in the above passage makes clear that what his Honour was there talking about was the proposition that the temporary nature of the affixation might of itself be determinative and expressing difficulty with that proposition. His Honour was not there saying that the permanence or otherwise of the affixation was irrelevant. Blackburn J said in *Holland v Hodgson* (1872) LR 7 CP 328 at 334-335:

> There is no doubt that the general maxim of the law is that what is annexed to the land becomes part of the land; but it is very difficult, if not impossible, to say with precision what constitutes an annexation sufficient for this purpose. It is a question which must depend on the circumstances of each case, and mainly on two circumstances, as indicating the intention, viz., the degree of annexation and the object of the annexation. When the article in question is no further attached to the land than by its own weight it is generally to be considered a mere chattel. … But even in such a case, if the intention is apparent to make the articles part of the land, they do become part of the land. ... On the other hand, an article may be very firmly fixed to the land, and yet the circumstances may be such as to shew that it is never intended to be part of the land, and then it does not become part of the land. ... Perhaps the true rule is, that articles not otherwise attached to the land than by their own weight are not to be considered as part of the land, unless the circumstances are such as to shew that they were intended to be part of the land, the onus of shewing that they were so intended lying on those who assert that they have ceased to be chattels, and that, on the contrary, an article which is affixed to the land even slightly is to be considered as part of the land, unless the circumstances are such as to shew that it was intended all along to continue [as] a chattel, the onus lying on those who contend that it is a chattel.

149   Sir Frederick Jordan, in *Australian Provincial Assurance Co Ltd v Coroneo* (1938) 38 SR (NSW) 700 at 712, said the following (in a passage later quoted by Conti J in *Blacker* and set out by Sackville AJA in *Agripower Barrabba*):

> The test of whether a chattel which has been to some extent fixed to land is a fixture is whether it has been fixed with the intention that it shall remain in position permanently or for an indefinite or substantial period, or whether it has been fixed with the intent that it shall remain in position only for some temporary purpose. In the former case, it is a fixture, whether it has been fixed for the better enjoyment of and land or building, or fixed merely to steady the thing itself, for the better use or enjoyment of the thing fixed. If it is proved to have been fixed merely for a temporary purpose it is not a fixture. The intention of the person fixing it must be gathered from the purpose for which and the time during which the user in the fixed positions contemplated. If a thing has been securely fixed, and in particular if it has been so fixed that it cannot be detached without substantial injury to the thing itself or to that to which it is attached, this supplies strong but not necessarily conclusive evidence that a permanent fixing was intended. On the other hand, the fact

that the fixing is very slight helps to support an inference that it was not intended to be permanent. But each case depends on its own facts.

150   I do not accept in light of the above that the "temporary" (or otherwise) purpose of affixation is an irrelevant consideration. In the present case, there was ample evidence to support the primary judge's conclusion that the Turbines were installed for a temporary purpose. This evidence supported the conclusion that objectively they were not intended to become part of the land. Neither the scale of the "temporary" power station, nor the fact that it was operated by a statutory corporation and was to supply the growing electricity needs of the region, gainsays the conclusion that the Turbines were installed on the land for a relatively short finite term and for an objectively temporary purpose (even though that term might have been extended and even if the use of the adjective "temporary" in the DBOM might be thought to have been somewhat of a misnomer since it was expected that there would be a larger longer term power station to be built there).

151   The analogy with tenant's fixtures again does not in my opinion assist greatly. It is not in dispute that, while affixed to a landlord's property, a tenant's fixture is part of the property (though with a right at common law and/or by way of contract for such an item to be removed). However, the existence of a contractual right to remove the Turbines does not mean that, absent such a right, they would have become fixtures at common law; it simply indicates that the parties were turning their minds to the question of removal at the end of the term of the lease (in the context that some items of plant were or might be required to be handed over).

152   Finally, insofar as the appellants accept that evidence (properly admitted) of the parties' subjective intentions as to reservation of title and the like may be admissible but contend that provisions of the contract that display their common intention in that regard are not, I do not consider that there is any logic to that distinction. In *N H Dunn*, Mahoney JA said (at 9244-5):

>   The actual or subjective intention of the parties and, a fortiori, of one of them, is, no doubt, not conclusive as to the status of the chattel. But I do not think that the intention of the owner of the chattel is irrelevant. In *Reid v Smith* (1905) 3 CLR at 680-1, O'Connor J cited with approval the following statement:

> "The intention of the party making the approval ultimately to remove it from the premises, will not, by any means, be a controlling factor. One may erect a brick or a stone house with the intention, after a brief occupancy, to tear it down and build another on the same spot, but that intention would not make the building a chattel. A destination which gives a moveable an immoveable character, results from facts and circumstances determined by the law itself and could never be established or taken away by the simple declaration of the proprietor, whether oral or written."

In *Anthony v Commonwealth*, supra, at 89, Walsh J, in relation to a telephone line, including poles and other equipment, said:

> "If the question to be considered was whether an actual intention could be inferred that the poles and the line should become the property of the landowner, it seems plain in the circumstances that that question would be answered 'no'. But, in my opinion, the question is not one of ascertaining the actual intention, but one of determining from the circumstances of the case, and in particular from the degree of annexation and the object of the annexation, what is the intention that ought to be imputed or presumed: see *Reid v Smith* (1905) 3 CLR 656 at 678, 681.

> There are, in my opinion, distinctions which must be made. *Whatever be the correct formulation of the fact to be proved in such disputes, it is not whether the owner of the chattel or any other person subjectively intended that it should or should not become part of the realty. Therefore a statement of the intention as to that particular matter is not a statement tending, as such, to prove the fact to be proved. But that intention, as such, is not necessarily irrelevant. Whether the question of whether chattels have become part of the realty is a question of fact (see supra) or a conclusion of law, various matters have been seen as of assistance in the final determination of it.* The period of time for which the chattel was to be in position, the degree of its annexation to the land, what was to be done with it, and the function to be served by its annexation, are all matters which have been seen to be relevant for this purpose. *In particular circumstances, statements made by the owner of the chattel or of the realty as to his intention that the chattel shall or shall not be part of the realty may, if appropriately proved and evidenced, be relevant as facts probative of such matters and therefore as relevant in the determination of the ultimate fact to be proved.* I do not see what was said by O'Connor J or Walsh J, in the case to which I have referred, as indicating a contrary view. [my emphasis]

153   In *Blacker*, Conti J said (at [11]-[12]):

> There is an abundance of authorities generally to the effect that the relevant intention is to be determined objectively from such facts and circumstances that are "patent for all to see", and not by reference to subjective intention: see for instance *Hobson v Gorringe* [1897] 1 Ch 182 at 193; *Melluish v BMI (No 3)* [1996] AC 454; *Elitestone Ltd v Morris* [1997] 1 WLR 687 at 693, 698; *Love v Bloomfield* [1906] VLR 723 at 729; *Re May Bros Ltd* [1929] SASR 508 at 513 and *Metal Manufacturers Ltd v FCT* (1999) 43 ATR 375 at 411.

> Despite this, there are some modern authorities which would leave room for recourse to actual and hence subjective intention. This may be more accurately limited to the extent that it would assist the Court to determine the

level of permanence or temporariness for which the item is intended to remain in position and the purpose to be served by its affixation or annexation: *see N H Dunn Pty Ltd v L M Ericsson Pty Ltd* (1979) 2 BPR 9241 at 9244-9245 where Mahoney JA referred to the observations of O'Connor J in *Reid v Smith* (1905) 3 CLR 656 at 680-681 and Walsh J in *Anthony v The Commonwealth* (1973) 47 ALJR 83 at 89; see also *Ball-Guymer v Livantes* (1990) 102 FLR 327 and Land Law, supra para 227. Indeed Professor Butt in his article ""Near enough is not good enough" or "We know what you mean"" (1997) 71 ALJ 816 at 821 has commented that:

> "While private agreements concerning the intended status of an item as chattel or fixture are not permitted to prejudice the interests of third parties, it is difficult to see why the courts should discount the parties' actual intentions where no third parties are involved."

154   There, his Honour did not need to express a view as to that issue. Nor, ultimately is it necessary to do so in the present case, save to accept that the common intention of the parties, objectively ascertained, is capable (if appropriately proved as was the case here) of shedding light on the purpose of the annexation of the chattel in question.

155   As to the third of the matters about which complaint is made (the physical characteristics of the Turbines) I have already noted the careful description by his Honour of the Turbines and the processes by which they were installed and commissioned and by which in due course they are to be demobilised.

156   Taking into account the factors put forward on both sides, and accepting that there are obvious constraints on the ready mobility of the Turbines once they have been installed and commissioned on the site, I am not persuaded that the primary judge erred in concluding that the Turbines did not become fixtures in the common law sense.

157   Grounds 4-5 are not made good.

**Conclusion**

158   For the above reasons, the appeal should be dismissed. Forge Power did not seek any costs order in that event. Therefore the order I propose is simply:

1.   Appeal dismissed.

**********